ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
  – and –
SPENCER A. BURKHOLZ (147029)
DAVID W. MITCHELL (199706)
BRIAN O. O'MARA (229737)
STEVEN M. JODLOWSKI (239074)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
davidm@rgrdlaw.com
bomara@rgrdlaw.com
sjodlowski@rgrdlaw.com

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID F. BERLINGER, Individually and On Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>        vs.<br><br>BIOMARIN PHARMACEUTICAL INC., JEAN-JACQUES BIENAIMÉ, HENRY J. FUCHS, AND LON CARDON,<br><br>                              Defendants. | Case No. 3:21-cv-08254-MMC<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br>DEMAND FOR JURY TRIAL |

4859-7139-2022.v2

1.     Lead Plaintiffs Local 282 Pension Trust Fund and Local 282 Annuity Trust Fund ("Plaintiffs" or "Local 282"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based upon, *inter alia*, their counsel and independent investigation.  This investigation included, but was not limited to, a review and analysis of: (i) BioMarin Pharmaceutical Inc.'s ("BioMarin" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of BioMarin's public conference calls; (iii) BioMarin's press releases; (iv) media and research reports regarding BioMarin; (v)  BioMarin's stock price movement, and pricing and volume data; and (vi) other publicly available material and data identified herein.  Counsel's investigation into the factual allegations contained in this Complaint is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

## INTRODUCTION AND SUMMARY OF THE ACTION

2.     This is a securities class action brought on behalf of all persons and entities who purchased or otherwise acquired BioMarin's publicly traded common stock between November 14, 2019 and February 23, 2022 (the "Class Period"), against BioMarin and certain of the Company's current and former executive officers[1] (together, "Defendants").  Plaintiffs seek remedies under the Securities Exchange Act of 1934 (the "Exchange Act") arising from Defendants' false and misleading statements and material omissions.

3.     BioMarin is a biotechnology company that develops and commercializes in therapies to address rare diseases and medical conditions.  In developing its therapies, BioMarin selects product candidates for diseases and conditions that represent an unmet medical need, have well-understood biology and provide an opportunity to be first-to-market or offer a significant

---

[1]   *See* ¶¶22-26.

benefit over existing products.  During the Class Period, the Company was developing, among other product candidates, an AAV5-phenylalanine hydroxylase (PAH) gene therapy designed to normalize blood phenylalanine (Phe) concentration levels in patients with phenylketonuria ("PKU") – a rare inherited disorder that causes the Phe amino acid to build up in the body – by inserting a correct copy of the PAH gene into liver cells.  Since 2008 BioMarin's primary PKU treatment was Kuvan, taken as a tablet or dissolvable powder, which has been administered to more than 7,800 patients in the U.S. and had been BioMarin's second biggest product, consistently making up about 30% of BioMarin's drug revenue.  In 2018, BioMarin added a second drug to its PKU franchise, when it received approval for Palynziq, an injectable enzyme therapy.  By the start of the Class Period Kuvan and Palynziq were the only approved drugs for the treatment of PKU. BioMarin's third PKU drug, a developmental PKU gene therapy that would come to be known as BMN 307, was to be a part of the Company's "PKU franchise" and represented the next generation of therapy in the Company's "pills to proteins to gene therapy" strategy.

4.     The development of BMN 307 was crucial to BioMarin, as in the fall of 2018, BioMarin's PKU franchise represented more than 30% of its revenue.  Competition was increasing and exclusivity for BioMarin's Kuvan treatment was expiring in 2020, opening the door to generic competition that would erode the profitability and market share of BioMarin's PKU franchise. Indeed, once competitors began marketing generic versions of Kuvan in 2020, BioMarin's Kuvan-generated revenue was almost halved, falling from $457 million in 2020 to $286 million in 2021. BioMarin attributed the steep revenue decline to the loss for exclusivity of Kuvan.[2]

5.     BioMarin portrayed its new gene therapy drugs such as BMN 307 as game changing single transformative treatments that could provide effectiveness well beyond existing therapies that required daily administration.  And with BNM 307, BioMarin could re-establish its PKU franchise.

---

[2]   Press Release, *BioMarin Announces Fourth Quarter and Full Year 2021 Financial Results and Corporate Updates*, February 23, 2022.

6.     On November 7, 2018, BioMarin held its 2018 Research and Development Day ("R&D Day") for investors and analysts.  Defendants Bienaimé, Fuchs, and Cardon, as well as other BioMarin executives, attended and made presentations to investors during the R&D Day, where the "main event" of the conference was BioMarin's new gene therapy, introduced as "BMN 307."  Defendant Cardon presented pre-clinical data for BMN 307 and described some of the mouse models used to develop BMN 307.  Among the "**number of [pre-clinical] studies, there's hundreds of mice involved in various studies**"[3] supporting BMN 307, BioMarin "took on" and completed "a **lifetime study of mice**, so the full longevity of mice, **80 weeks** it is in this particular model, and **asked what the effect of this particular treatment is** on those."  Defendants also explained that beyond the pre-clinical mouse studies, BioMarin had progressed to nonhuman primate studies and that those "nonhuman primates studies are already reading out."

7.     Defendants confirmed that they would "'complete preclinical studies in the first half of 2019,'" and that thereafter they would file an investigational new drug ("IND") application for BMN 307 with the United States Food and Drug Administration ("FDA") in the second half of 2019.

8.     At the Company's 2019 R&D Day for investors and analysts, held the next year on November 14, 2019, Defendants again highlighted the pre-clinical data they had observed in studies lasting as long as 80 weeks, confirming that they had already filed their regulatory clinical trial application with the U.K. and that BMN 307's IND submission was "imminent."  Commenting on their pre-clinical observations, Defendants addressed "**durability considerations for PKU**," proclaiming: "**The mouse data looked great as far out as the eye could see in terms of durability.**"

9.     On January 13, 2020, Defendants confirmed that BMN 307's IND had been approved, and Defendants confirmed that **BMN 307 had moved beyond the "Preclinical" stage and had transitioned to "Clinical Phase 1/2**," *i.e.* human trials.

---

[3]     Emphasis added unless otherwise noted.

10.     Over the next two-and-half years, as BioMarin proceeded with clinical trials and began dosing human patients, Defendants repeatedly and without reservation touted the safety and effectiveness of BMN 307, citing prior pre-clinical studies and data observations out to 80 weeks. For example, in early 2020, Bienaimé proclaimed: "***us[ing] a very well-established PKU mouse model . . . [w]e show there is no safety issue***."  And when addressing questions about BMN 307's durability, Fuchs assured investors that "[t]he ***ENU2 mice data are very encouraging and very consistent with what you see in the field in general***."  Defendants also repeatedly highlighted the significant impact the drug would have on BioMarin's PKU portfolio and overall business and touted its prospects for FDA approval.

11.     Unbeknownst to the investing public, however, but known to and concealed by Defendants, the proclaimed success of BMN 307's pre-clinical trials and the viability of BioMarin's new gene therapy was not as Defendants portrayed.  In fact, while BioMarin's pre-clinical studies continued out as long as 80 weeks and Defendants maintained that "***[t]he mouse data looked great as far out as the eye could see in terms of durability***," they later admitted that they had observed liver tumors in mice "at 52 weeks in a pre-clinical study to test BMN 307's durability."  This adverse information was withheld from investors.

12.     Investors began to learn the truth when, on Sunday, September 5, 2021, BioMarin revealed that the FDA had placed a clinical hold on the BMN 307 Phearless Phase 1/2 clinical study based on safety findings from a pre-clinical mouse study where 85% of "***animals administered BMN 307 at the highest dose group (2e14 Vg/kg) [revealed] tumors [after a] liver necropsy 52 weeks after dosing*** with evidence for integration of portions of AAV vector into the genome."

13.     The market was shocked by this revelation, and BioMarin's stock price fell $7.14 per share, or 8.4%, to close at $77.81 per share on September 7, 2021, the next trading day following the Labor Day holiday.  And within the few weeks following disclosure of the preclinical liver tumors and FDA hold, Cardon – responsible for driving BioMarin's scientific strategy and enriching its product pipeline – quietly disappeared from the Company.

14.     Unwilling to accept responsibility for concealing the truth, Defendants downplayed the seriousness of the liver tumors and the FDA's clinical hold.  Defendants claimed that the tumors were not cause for concern because "[a]ll of these effects have been observed in other mice studies previously" and downplayed the serious safety issues asserting that the dose of BMN 307 that resulted in the liver tumors was "much higher than the dose that we treat our patients so far." As if an 85% tumor rate could ever be glossed over, Defendants' excuse is not credible.  They were in the midst of a dose escalation clinical study and had acknowledged before the truth was revealed that they had no idea what the correct human dose would be because "***you can only find that out when you go into human[ clinical trials]***" and "***we may have to go to a higher dose as well***."  Defendants also expressed confidence as late as January 6, 2022, that they would be permitted to resume the clinical studies in early 2022.

15.     But the FDA did not share BioMarin's misplaced optimism regarding tumors and clinical hold, however, and just a few weeks later, on February 17, 2022, Defendants disclosed that the clinical hold would not be lifted in the first quarter of 2022, as the FDA had requested "data from additional non-clinical studies," which was "expected to take several quarters."

16.     As investors came to the realization that the clinical hold was far more severe and would last much longer than Defendants had previously claimed, the market reacted swiftly, sending the price of BioMarin falling $13 per share, or more than 14% from February 17, 2022 through February 24, 2022.

### JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act and §27 of the Exchange Act (15 U.S.C. §78aa).

19.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because BioMarin maintains its corporate headquarters in San Rafael, California, which is situated in this District, and Defendants conduct substantial business

in this District.  In addition, many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.

20.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

21.     Plaintiffs Local 282 Pension Trust Fund and Local 282 Annuity Trust Fund District No. 9 provide retirement and welfare benefits to current and retired members of their affiliated local unions.  The Local 282 Trust Funds are jointly administered by a board of trustees of both labor and management representatives.  On January 10, 2022, the Court appointed Local 282 as Lead Plaintiff to represent the proposed class of BioMarin shareholders.  As reflected in Local 282's certification attached hereto, Plaintiffs purchased and held shares of BioMarin stock during the Class Period.  As a result of the Defendants' conduct detailed herein, Local 282 suffered damages in connection with its purchases of BioMarin securities.

22.     Defendant BioMarin is a biotechnology company located in California and headquartered at 770 Lindaro Street, San Rafael, CA 94901.  At all relevant times, the Company's common stock traded on the Nasdaq Stock Market ("NASDAQ"), an efficient market, under the ticker symbol "BMRN."  As of February 22, 2022, BioMarin had over 184 million shares of common stock outstanding.

23.     Defendant Jean-Jacques Bienaimé ("Bienaimé") currently serves as BioMarin's Chairman and Chief Executive Officer ("CEO").  Defendant Bienaimé joined the Company as CEO and member of the Board of Directors in May 2005.

(a)     During the Class Period, defendant Bienaimé was responsible for the issuance of false and misleading statements and omissions about BioMarin and failed to disclose the true facts about BMN 307.  *See* ¶¶66, 73, 77, 82, 89, 96, 103.  In addition to issuing false and

1    misleading statements throughout the Class Period, Bienaimé repeatedly had the opportunity to

2    correct the misstatements and omissions by and on behalf of BioMarin, and failed to do so.

3            (b)    As CEO and Chairman of the board of directors, Bienaimé was responsible

4    for directing BioMarin's business development, public statements, and financial and business

5    affairs.  Specifically, during conference calls with analysts and investors, Bienaimé repeatedly held

6    himself out as knowledgeable about BioMarin's gene therapy development and BMN 307, and the

7    Company's business prospects.  At no time during the Class Period did Bienaimé assert that he

8    was not aware of material aspects of BioMarin's core drug development operations, including the

9    gene therapy development and preclinical trials and results for BMN 307.

10           (c)    In 2019 and 2020, Bienaimé received over \$36.5 million in total

11    compensation.[4]  And, during the Class Period as set forth in ¶131, Bienaimé sold 298,000 shares

12    of his BioMarin stock at prices inflated by Defendants' false and misleading statements and

13    omissions for proceeds of over \$25.2 million.

14         24.    Defendant Henry J. Fuchs ("Fuchs") served as BioMarin's President of Worldwide

15    Research & Development during the Class Period.  Defendant Fuchs joined the Company in March

16    2009 as Executive Vice President and Chief Medical Officer.

17           (a)    During the Class Period, defendant Fuchs was responsible for the issuance

18    of false and misleading statements and omissions about BioMarin and failed to disclose the true

19    facts about BMN 307.  *See* ¶¶66, 73, 77, 82, 89, 96, 103.  In addition to issuing false and misleading

20    statements throughout the Class Period, Fuchs repeatedly had the opportunity to correct the

21    misstatements and omissions by and on behalf of BioMarin, and failed to do so.

22           (b)    As President of Worldwide Research & Development, Fuchs was

23    responsible for overseeing and directing BioMarin's gene therapy development and the preclinical

24    trials for BMN 307, including BioMarin's public statements concerning such activities.

25    Specifically, during conference calls with analysts and investors, Fuchs repeatedly held himself

26    out as knowledgeable about BioMarin's gene therapy development and BMN 307, and the

27

28    [4]    Compensation information for 2021 have not yet been publicly disclosed.

Company's business prospects.  At no time during the Class Period did Fuchs assert that he was not aware of material aspects of BioMarin's core drug development operations, including the gene therapy development and preclinical trials and results for BMN 307.

(c)     In 2019 and 2020, Fuchs received over $14 million in total compensation. And, during the Class Period as set forth in ¶130, Fuchs sold 186,600 shares of his BioMarin stock at prices inflated by Defendants' false and misleading statements and omissions for proceeds of over $22.8 million.

25.     Defendant Lon Cardon ("Cardon") was promoted to this role on October 7, 2019, just weeks before the beginning of the Class Period, when he discussed completion of BMN 307's safety, efficacy, and toxicology studies, and represented that "[t]he mouse data looked great as far out as the eye could see in terms of durability" at the 2019 R&D Day conference.  Cardon abruptly left BioMarin at the end of the Class Period, just weeks after Defendants revealed that they had observed liver tumors in a BMN 307 pre-clinical study.

(a)     During the Class Period, defendant Cardon was responsible for the issuance of false and misleading statements and omissions about BioMarin and failed to disclose the true facts about BMN 307.  ¶¶66, 73, 77, 82, 89, 96, 103.  In addition to issuing false and misleading statements throughout the Class Period, defendant Cardon repeatedly had the opportunity to correct the misstatements and omissions by and on behalf of BioMarin, and failed to do so.

(b)     As its top scientist, Cardon was responsible for research functions at BioMarin and oversight of the Company's product portfolio.  Cardon worked to translate the results of genetic research regarding the causes of human diseases into medical treatments developed by the Company.  In his capacity as a chief "strategy" officer, Cardon was responsible for "enrich[ing] BioMarin's pipeline," "drive[] the future growth of the company," and "lead BioMarin's scientific strategy."  During conference calls with analysts and investors, Cardon held himself out as knowledgeable about BioMarin's gene therapy development and BMN 307, and the Company's business prospects.  At no time during the Class Period did Cardon assert that he was not aware of material aspects of BioMarin's drug development operations, including the gene therapy development and preclinical trials and data for BMN 307.

1       (c)     Within weeks of disclosing that Defendants had observed liver tumors in

2 BioMarin's pre-clinical studies, and no later than October 4, 2021, defendant Cardon was no longer

3 employed by BioMarin.

4       26.     Defendants Bienaimé, Fuchs, and Cardon, because of their positions with the

5 Company, possessed the power and authority to control the contents of BioMarin's public

6 statements, including the Company's quarterly and annual reports, press releases, and

7 presentations to securities analysts, money and portfolio managers, and individual and institutional

8 investors.  They were provided with copies of the Company's results, reports and press releases

9 alleged herein to be false and misleading prior to or shortly after their issuance and had the ability

10 and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions

11 with the Company, and their access to material non-public information available to them but not

12 to the public, these Defendants knew that the adverse facts specified herein had not been disclosed

13 to and were being concealed from the public and that the positive representations being made were

14 then materially false and misleading.

15                 **FACTUAL BACKGROUND**

16       27.     BioMarin is a specialty biotechnology and pharmaceutical company headquartered

17 in San Rafael, California.  Historically, BioMarin has researched, developed, and commercialized

18 pharmaceuticals to treat rare diseases and medical conditions.  Specifically, BioMarin focuses on

19 the development and commercialization of drugs with "orphan drug" status—drugs that treat

20 medical conditions that are so rare they would not be profitable to produce without government

21 assistance.  In the United States, an orphan drug is one that treats a rare condition or disease that

22 affects fewer than 200,000 people.  BioMarin describes itself as focused on "select[ing] product

23 candidates for diseases and conditions that represent a significant unmet medical need, have well-

24 understood biology and provide an opportunity to be first-to-market or offer a significant benefit

25 over existing products."

26       28.     As described by BioMarin, the Company's focus on rare diseases and conditions

27 requires the Company to secure "significant market share and maintain high per-patient prices for

28 [its] products to achieve profitability."  To achieve these goals, BioMarin focuses on first-to-market

orphan drugs, which can come with significant and highly lucrative exclusivity rights. Even more, orphan drugs are exempt from the Medicaid mandatory discount pricing established by the Affordable Care Act. The average annual cost of orphan drug treatments far exceeds "mainstream" treatments; "orphan drugs have an average annual cost of $32,000, and more than a third of drugs with orphan indications cost more than $100,000 annually."[5]

29.     At the beginning of the Class Period, BioMarin's drug portfolio consisted of six FDA-approved orphan drugs.  One of its drugs, Kuvan, accounted for nearly 30% of the Company's total net revenue in 2019.  However, BioMarin's patent for Kuvan was soon due to expire, and generic versions of Kuvan would begin eroding BioMarin's profits in the Kuvan revenue and PKU franchise.  Accordingly, by the beginning of the Class Period, BioMarin faced a threat to nearly one-third of its revenue due to generic competition, and BioMarin was relying heavily on its pipeline of developmental drugs to defend against these threats to the Company's revenue.

**Overview of the FDA Approval Process and FDA's Focus on Gene Therapy**

30.     A pharmaceutical company seeking FDA approval to sell a new prescription drug must complete a five-step process: (a) discovery of a potential new drug; (b) preclinical laboratory tests, preclinical studies in animals, formulation studies, and the submission to the FDA of an investigational new drug application, or IND; (c) adequate and well-controlled clinical trials to establish the safety and efficacy of the drug for each indication sought; (d) the submission of a new drug application, or NDA, to the FDA; and (e) FDA review and approval of the NDA or BLA.

31.     Preclinical tests include laboratory evaluation of product chemistry, formulation, and toxicity, as well as animal studies.  During preclinical research, the company must conduct laboratory tests and try the drug on animals and then people to make sure it works and is safe.  As BioMarin explained before the Class Period, "we may need to perform multiple preclinical studies

---

[5]     *Orphan Drugs in the United States, Rare Disease and Cost Trends Through 2019*, IQVIA Institute for Human Data Science, at Overview, page 4 (December 2020). (https://www.iqvia.com/insights/the-iqvia-institute/reports/orphan-drugs-in-the-united-states-rare-disease-innovation-and-cost-trends-through-2019).

1   using various doses and formulations before we can begin clinical trials."[6]  The FDA regulates the

2   laboratory work and facilities through good laboratory practice ("GLP") regulations.  Researchers

3   typically use GLP, defined in medical product development regulations (*see* 21 CFR, Part 58.1),

4   for preclinical laboratory studies.  In some cases, researchers use non-GLP studies that do not

5   require the rigor of GLP studies.  The GLP regulations are found in 21 CFR Part 58.1: *Good*

6   *Laboratory Practice for Nonclinical Laboratory Studies*.  GLP studies must provide detailed

7   information on dosing and toxicity levels, and the results of preclinical testing are submitted to the

8   FDA as part of an IND.  The FDA may impose a clinical hold, for example, if it finds that human

9   subjects will be exposed to an unreasonable and significant risk of injury, or if the IND does not

10  contain sufficient information to assess the risks to subjects of the proposed study.

11      32.     After preclinical testing, researchers review their findings and decide whether the

12  drug should be tested in people.  Clinical trials to support new drug applications are typically

13  conducted in three sequential phases, although the phases may overlap.  As BioMarin explained

14  it, "After we have conducted preclinical studies, we must demonstrate that our product candidates

15  are safe and efficacious for use in the targeted human patients in order to receive regulatory

16  approval for commercial sale."[7]

17      33.     During Phase 1, clinical trials are conducted with a small number of human subjects

18  to assess the metabolism, pharmacokinetics, and pharmacological actions of the drug, to determine

19  the side effects associated with increasing doses, and if possible to gain early evidence of the drug's

20  efficacy.  Phase 2 usually involves studies in a limited patient population to assess the efficacy of

21  the drug in specific, targeted indications; assess dosage tolerance and optimal dosage; and

22  determine common short-term side effects and risks associated with the drug.  If a compound is

23  found to be potentially effective and to have an acceptable safety profile in Phase 1 and 2

24  evaluations, Phase 3 trials are undertaken to further demonstrate efficacy and to further test for

25  safety in an expanded patient population at geographically dispersed clinical trial sites.  Phase 3

26

----

27  [6]   BioMarin's Form 10Q for 2Q 2019, filed August 1, 2019.

28  [7]   BioMarin's Form 10Q for 2Q 2019, filed August 1, 2019.

1   trials are intended to gather the additional information about safety and efficacy that is needed to

2   support product approval.

3       34.     The FDA has the authority to expedite its review of a drug intended for the

4   treatment of a serious or life-threatening condition, if the sponsor demonstrates that the product

5   has the potential to address an unmet medical need.  Such products are designated as "fast track

6   products."  The FDA's "fast track" authority can significantly shorten the clinical trial process and

7   regulatory review.  Here, as discussed below, BioMarin applied for "fast track" designation for

8   BMN 307.

9       35.     Any clinical trial conducted under an IND is subject to FDA regulations, including

10  its good clinical practices, or GCP, requirements (which include safety reporting requirements),

11  informed consent requirements, and institutional review board, or IRB, requirements.  As is the

12  case with BMN 307, the FDA may at any time halt an ongoing clinical trial, if the agency believes

13  that patients participating in the trial will be or are being exposed to unacceptable health risks.  The

14  FDA may also terminate an IND and require the sponsor to end all clinical trials under the IND, if

15  it finds deficiencies in the IND or in the conduct of the trial under the IND.

16      36.     After successful completion of the required clinical trials, a new drug application

17  or biologics license application (collectively an "application") is generally submitted.  In order for

18  a new drug to be approved, the application must demonstrate that it is safe and effective and that

19  it is manufactured in compliance with current good manufacturing practices, or cGMP.

20  **The FDA's Focus on the Safety of Gene Therapy**

21      37.     Gene therapy is the process of replacing damaged or unhealthy genetic material that

22  causes a medical problem, adding genes to help the body fight disease, or turn off genes that are

23  causing problems.  In order to insert new genes directly into cells, scientists use a vehicle called a

24  "vector" which is genetically engineered to deliver the gene.  Gene therapy can be used to modify

25  cells inside or outside the body.  When used to modify cells inside the body, a doctor will inject

26  the vector, such as a virus called adeno-associated virus, or AAV, carrying the gene directly into

27  the part of the body that has defective cells.

28

38.     Safety concerns have dogged gene therapy ever since a series of setbacks two decades ago temporarily halted research and chilled further investment.  Most gene therapies are designed to achieve permanent or long-lasting effects in the human body, and this inherently increases the risk of adverse events.

39.     Early studies showed that gene therapy could have very serious health risks, such as toxicity, inflammation, and cancer.  More than 20 years ago, a single gene-therapy study death all but halted the research in its tracks, when a mostly healthy 18-year-old named Jesse Gelsinger died of multi-organ failure after receiving an experimental gene therapy for a rare liver disease.  In response to this event, the FDA undertook a series of steps to ensure that all gene therapy sponsors strengthen the systems they had in place for product quality assurance and clinical trial oversight and monitoring for safety issues.  In March 2000, the FDA issued the "Gene Therapy Letter" to sponsors of all gene therapy INDs, requesting to submit yearly reports summarizing various aspects of their product development, including product quality, manufacturing, animal safety, and clinical trial conduct.  Since 2000, sponsors of gene therapy INDs have submitted their product, preclinical, and clinical information to the FDA for evaluation and feedback, and the FDA has suspended numerous gene therapy trials after clinical patients developed serious health issues, such as leukemia.  Numerous public advisory committee meetings have been held.

40.     Recently, as sponsors have renewed their efforts into developing gene therapy drugs, there have been multiple reports of treatment emergent serious adverse events in AAV vector-based gene therapy trials.  In 2019 a patient dosed with an experimental gene therapy for hemophilia being developed by Amsterdam-based uniQure was diagnosed with Hepatocellular carcinoma (HCC), the most common form of primary liver cancer.  In the summer of 2020, four boys died in an Astellas Pharma study of young children with X-linked Myotubular Myopathy after developing liver dysfunction in the weeks after treatment.  In a clinical trial of an Audentes Therapeutics gene therapy for a rare neuromuscular disease, liver-related side effects lead to the death of three patients.

41.     These issues have led the FDA to flag safety concerns for gene therapies ranging from liver toxicity to kidney injury to tumor formation, and publish guidance to drug sponsors in

1  which it emphasized the need for preclinical work that studied and identified any such issues before

2  human trials begin.

3      42.    In November 2013 guidance, *Preclinical Assessment of Investigational Cellular*

4  *and Gene Therapy Products*, the FDA said the fate of an investigational gene therapy product in

5  animals is "important" in determining the safety profile of a drug, and it specifically mentioned

6  tumorgenicity as a potential safety concern that must be studied.   To that end, the FDA

7  recommended that a pre-clinical trial for gene therapy products should not only be designed to

8  show the survival of cells for a sufficient length of time to allow for potential tumor formation,

9  but should include at least one dose level that constitutes the maximum absolute amount of cells

10  that can be administered.[8]

11      43.    In a November 2017 presentation, Preclinical Considerations for Gene Therapy

12  Products: An FDA Perspective, the FDA reiterated that tumorigenicity and carcinogenicity are

13  safety concerns that must be taken into account when designing pre-clinical studies.  Such concerns

14  must "[a]ssessed prior to the FIH [first in human] clinical trial."[9]

15      44.    In January 2020, following an increase in preclinical use of AAV by drug sponsors,

16  the FDA released detailed guidance to sponsors developing human gene therapy products intended

17  to treat a rare disease in adult and/or pediatric patients regarding the manufacturing, preclinical,

18  and clinical trial design issues for all phases of the clinical development program.   Such

19  information, it explained, was intended to assist sponsors in designing clinical development

20  programs for gene therapy products, where there may be limited study population size and

21  potential safety issues.   To justify conducting human (clinical) trials, the FDA recommended,

22  among other things, that a new drug sponsor consider and identify any safety concerns and

23  potential toxicities when performing pre-clinical studies.

24

25

---

26  [8]    https://www.fda.gov/media/87564/download; https://www.fda.gov/media/87593/download

27  [9]    https://www.toxicology.org/groups/sig/aact/images/AACT%20webinar.presentation.
    Huang.final.pdf

28

45.     In September 2021, the FDA held a two-day meeting specifically to discuss toxicity risks of adeno-associated virus (AAV) vector-based gene therapy product.  The meeting was held in response to toxicities observed in animals and humans after administration of gene therapy products.  As it observed, in recent years "there have been multiple reports of treatment-emergent serious adverse events (TESAEs, serious adverse events that occur after treatment has started) in GT studies with AAV vector-based products."  The discussion included the role of patient disease state, clinical trial exclusion criteria, AAV administration procedure, long-term patient monitoring, vector dose, and drug product quality, in addition to potential further non-clinical studies.

**BioMarin's PKU Franchise, "Pill to Protein to Gene Therapy."**

46.     PKU is a rare inherited disorder that causes an amino acid called phenylalanine (Phe) to build up in the body.  PKU is caused by a defect in the gene that helps create the enzyme needed to break down phenylalanine.  Without the enzyme necessary to process phenylalanine, a dangerous buildup can develop when a person with PKU eats foods that contain protein or eats aspartame, an artificial sweetener.  This can eventually lead to serious health problems.

47.     In 2007, BioMarin received FDA approval for Kuvan, the first drug therapy for the treatment of PKU.  Since then, Kuvan, which is taken as a tablet or dissolvable powder, has been administered to more than 7,800 patients in the U.S. and has been BioMarin's second biggest product, consistently generating about 30% of BioMarin's drug revenue.

48.     In 2018, BioMarin added a second therapy to its PKU franchise, when it received approval for Palynziq, an injectable enzyme therapy.

49.     For more than a decade, Kuvan was the only FDA-approved drug treatment for PKU.  But, in recent years, BioMarin has begun to face competition from generic versions of Kuvan.  For example, Par Pharmaceutical Cos. Inc., applied for approval of its generic version of Kuvan in February 2016, and pharmaceutical company Dr. Reddy, likewise announced that it would seek approval to sell generic Kuvan.  Once both competitors began marketing their generic versions in 2020, BioMarin's Kuvan revenue was immediately halved, from $457 million in 2020 to $286 million in 2021.  In a press release announcing fourth quarter and full year 2021 business

1   and financial results, BioMarin attributed the steep decline in revenue to the loss of exclusivity of

2   Kuvan.

3       50.   To combat this competition and preserve its PKU franchise, BioMarin begun

4   developing a third potential PKU treatment, a gene therapy designed to normalize blood

5   phenylalanine (Phe) concentration levels in PKU patients.  This gene therapy would be known as

6   "BMN 307."  Unlike previous drugs, BMN 307 was designed to offer long-lasting PKU relief – a

7   one-and-done treatment.  The development of the BMN 307 gene therapy was the next phase in

8   BioMarin's "pill to protein to gene therapy" strategy.

9   **BioMarin's 2018 R&D Day and Announcement of BMN 307**

10       51.   At BioMarin's annual R&D Day, held on November 7, 2018, BioMarin  provided

11   an update on its development pipeline.  Among others, defendants Bienaimé, Fuchs, and Cardon

12   attended the conference, and defendant Fuchs introduced analysts and investors to the Company's

13   next iteration in BioMarin's PKUportfolio – a new investigational PKU gene therapy, known as

14   "BMN 307."

15       52.   BMN 307 was the "main event" of the 2018 R&D Day and Cardon, BioMarin's

16   Senior VP & Chief Scientific Officer, "shared pre-clinical data of its investigational gene therapy

17   program for PKU using an AAV5 PAH vector, which demonstrated lifetime Phe corrections in

18   mouse models":

19           ***So let's go to the main event, PKU gene therapy.***  I've given you now a bit
20   of the approach that BioMarin has and a bit of the vision on where we're going to
go.  Let's get to the PKU gene therapy.  Now, you'll know that BioMarin has a long
history in this particular disease.  We know the patients, we know the disease, we're
21   involved very carefully with the physicians back a decade from Kuvan, a great
recent approval of Palynziq and hopefully, with the candidate for gene therapy on
22   PKU.  Our treatments are really mirroring the progress of science, it's ***pills to
proteins to gene therapy***.  That's exactly how the field has gone and that's exactly
23   how we are going. . . .   What I'll walk through with you then is basically the
chronology of how we came to the program that we've got, okay? I'll go through
24   each of these in a bit of detail.  Firstly, just screening, to see if we have a product
for gene therapy.  And we did that by examination of coat color, I'll walk through
25   that.  We then looked more quantitatively at levels of phenylalanine and how far
down we can correct the disorder.  We then went into a program.  As I mentioned
26   before, we've invested in vector biology and gene therapy to improve the potency
further of that and decrease the dose, and I'll show you the results of that.  If we are
27   appropriately correcting the defect here of phenylalanine, we should have
consequences on neurotransmitters and ultimately on neurocognitive deficits.  ***I'll
28   show you the data that we've developed preclinically on that.***  And finally, just as

a hint toward the end, you'll see that we correct phenylalanine so well into such a level that we needed to make sure that we don't overshoot on this and correct too far from turning a hyper phenylalanine state into a hypo Phe state. The biology is helping us there. But nonetheless, we've explored that thoroughly and **don't feel, at least preclinically, that we have concerns in that area**. I'll walk through that as well.

   **So to introduce you to the program**. We call it BioMarin 307. It's a liver-directed gene therapy. We are you using AAV 5, leveraging the work from valrox with hemophilia. **We will have our IND filing in the second half of 2019**, and we'll go straight into commercial scale material with our first patient. So there will be no transition in the overall process with BioMarin 307 from the very first patient until the filing.

   In order **to develop this product, we used a validated mouse model of PKU, it's the ENU2 mouse. It's used by many groups**. It's a good mouse model as far as these go because it does recapitulate a number of the phenotypes that we're interested in, in humans with respect to phenylalanine levels, neurotransmitters, et cetera.

        \*   \*   \*

So we – **there's a number of studies**, there's **hundreds of mice involved in various studies** that – in all of this work that I'm describing to you. This next one we undertook for quite a long time. In fact, we took a life – **we took on a lifetime study of mice, so the full longevity of mice, 80 weeks it is in this particular model**, and asked **what the effect of this particular treatment is on those**. And I'll show you just here. The black lines there are the mutant mouse. These are PKU mice, effectively. That's the mutant mouse with no treatment, okay, or with a vehicle. And you can see that those are different mice, the lines are different mice themselves, and you can see they're getting smaller because that's the end of the lifetime of those mice under the mutant model.

   53.  Cardon concluded by summarizing the results of the BMN 307 program and laying out the next steps in developing BioMarin's next generation PKU therapy:

   So that's our PKU gene therapy, our program. **The summary is in the mice, in the ENU2 model of mice**, we got lifetime Phe normalization. We've got normalized neurotransmitter levels. We vector optimized to improve our potency. I think it's a great advantage that we have all the experience that we have with AAV 5 and with manufacturing. We've leveraged that for this particular program. I mentioned that we're – **our nonhuman primates studies are already reading out** in terms of data they already have, in terms of the hypo Phe state, and are continuing for the other investigations. **All of our nonclinical studies will be done in the first half of next year**. We'll have the commercial scale material available in **the second half, which is when we'll file our IND**. That is the PKU story.

        \*   \*   \*

- **Next steps:**
  - NHP studies are currently reading out
  - All non-clinical studies complete in 1H19
  - Leveroni commercial scale material available in 2H19
  - IND filing in 2H19

54.    In response to questions from analysts about whether BioMarin expected *translatability issues of the drug from mice to humans*, Cardon confirmed:

> ***We're not expecting any***.  And we've got some things going for us already. Remember, that's the human version of the treatment that we're including and we've looked at in nonhuman primates, so we're not just in mice at this point.  We debated behind the scenes whether even to describe the hypo Phe data.  I wanted to show it just to be comprehensive about the whole thing.  The modulation biology should work here.  And it should take care of it for us.  But because we know of individual differences in response to gene therapy in general, and because we're normalizing it so beautifully, I thought it would be worth just showing out there. ***And in fact, we can't drive it to a hypo Phe state, at least, in nonhuman primates and in mice, and we don't expect it to be different.***

55.    Also on November 7, 2018, in conjunction with the R&D Day, BioMarin issued a press release titled: *BioMarin Highlights Breadth of Innovative Development Pipeline at R&D Day on November 7th in New York*, in which the Company explained that it had "updated the investment community on the Company's research and development portfolio":

### BMN 307 Program Update

> ***BioMarin shared pre-clinical data of its investigational gene therapy program for PKU using an AAV5 PAH vector, which demonstrated lifetime Phe corrections in mouse models***.  Mouse coat color is a readily detectable biomarker of therapeutic response, and the coat color of all of the mice treated with BMN 307 changed from light brown, evidence of high Phe levels, to black, evidence of therapeutic activity.   Treated mice showed normalized Phe levels sustained ***through 80 weeks***, associated with normalization of circulating neurotransmitter levels, which are involved in neurological characteristics of human PKU.

> BioMarin plans to file an investigational new drug application (IND) for BMN 307 with the FDA in the second half of 2019.

56.    Bienaimé provided additional commentary on BMN 307's pre-clinical data on January 7, 2019 during the JPMorgan Global Healthcare Conference, where he addressed investors and analysts and described the lengthy, lifetime, 80-week pre-clinical studies:

> So case in points, BMN 307 for PKU gene therapy ***anticipated to get IND before the end of this year***.  We use a variegated mouse model, the ENU2 mice model, which we use for Kuvan and Palynziq.  The model is very close to the human PKU phenotype.  So we've been able to show that we can restore functions, and one of the characteristics of the PKU mice is that they have a discolored light coat

color, and if you treat them with our gene therapy product, they come back into a normal colored mouse. ***But more exciting, we have now, and we have presented that data last November, but this is model we treated mice with one injection of our PKU gene therapy drug product.*** And you see then within 2 months, so this is the Phe levels, on the Y axis are the Phe levels, the weeks on the x-axis. We did 2 weeks, we normalized the Phe levels on this mice. So you can see that at the bottom of the slide here, there is no difference between wild type Phe levels here and the ENU2 mice that were treated with our product. So there is absolute normalization of the Phe levels here. ***For 80 weeks, which is about 2 years, close to 2 years, which is the normal – close to normal lifespan of mice. And our mice appear to live longer than our competitors' mouse for unexplained reasons.***

57.     On February 21, 2019, BioMarin announced its full year and fourth quarter 2018 business and financial results. Addressing BNM 307, Bienaimé confirmed the progress of BMN 307 and the data that was shared at the 2018 R&D Day and in January 2019, providing: "'BMN 307, our gene therapy product for PKU, . . . demonstrated lifetime normalization of Phe in a validated PKU mouse model. ***We plan to complete preclinical studies in the first half of 2019*** with an anticipated IND filing planned for the second half of 2019.'" And in the Company's corresponding press release also issued on February 21, 2019, BioMarin provided:

**BioMarin Announces Full Year and Fourth Quarter 2018 Results**

\*          \*          \*

Mr. Bienaimé continued, "In November of 2018, we showcased a number of our other pipeline and research programs at BioMarin's annual Research and Development Day. . . . [W]e were pleased to share initial pre-clinical data for BMN 307, our gene therapy product for PKU, which ***demonstrated lifetime normalization*** of Phe in a validated PKU mouse model. We plan to ***complete preclinical studies in the first half of 2019 with an anticipated IND filing planned for the second half of 2019***."

\*          \*          \*

**Key Program Highlights**

\*          \*          \*

•       **BMN 307 gene therapy product candidate for phenylketonuria (PKU)**: The Company expects to submit an investigational new drug application (IND) and/or a clinical trial application (CTA) for a gene therapy product for the treatment of PKU in the second half of 2019. At R&D Day 2018, ***BioMarin shared data with BMN 307 that demonstrated a lifetime Phe correction sustained at 80 weeks in preclinical mouse models***. BMN 307 is an AAV vector containing the DNA sequence that codes for the phenylalanine hydroxylase enzyme that is deficient in people with PKU.

1      58.     On February 21, 2019, Defendants held a conference call with investors and

2   analysts to discuss the Company's 4Q 2018 business and financial results.   Among others,

3   defendants Bienaimé and Fuchs participated in the investor conference call.   During the call,

4   defendant Fuchs described BMN 307's status and 80-week studies:

> ***Recall the preclinical data we shared in January, using the ENU2 mouse model,
> which we used for Palynziq and which is close within a PKU phenotype.   We
> demonstrated that within 2 weeks, Phe levels would normalize with BMN 307
> treatment, continuing out to 80 weeks, well beyond the expected lifespan of the
> untreated ENU2 mouse***.   We look forward to putting this product in the clinic and
> to leveraging our valrox manufacturing experience to initiate clinical studies with
> commercial scale material.

9      59.     During the Q&A portion of the Q4 2018 conference call with analysts and

10   investors, defendant Fuchs addressed the documented "durable expression" documented in BMN

11   307's pre-clinical trials:

> *Analyst*: . . .  And then on your PKU gene therapy, so it looked like the data we got
> at the R&D Day was using your mirroring construct.  So just to clarify, ***are you
> able to show lifetime durability*** using a [humanized] construct? And what type of
> translational work are you doing with nonhuman primates in order to get a better
> understanding on how your – how 307 will behave in patients?
>
> *Fuchs*: . . . As far as the construct's use for 307, we showed you both the mirroring
> construct going out a really long time and shorter duration experiments for the
> human construct.   You can't evaluate durability of expression of the human
> construct in a mirroring species given the heterologous nature of the protein.   So
> the experiments that we [indiscernible] species.   The – ***so the experiments that
> document durable expression were done with mirroring construct.  We have no
> reason to expect that in humans the human construct will behave any differently.***
> And I think your last question was about nonhuman primates, but I think we've
> covered a lot of ground right here.

20      60.     On August 1, 2019, in connection with the Company's 2Q 2019 results, Defendants

21   held a conference call with analysts and investors during which they discussed BioMarin's PKU

22   gene therapy.   Among others, defendants Bienaimé and Fuchs participated in the investor

23   conference call.   During the call, Jeffrey Ajer, BioMarin's Executive Vice President and Chief

24   Commercial Officer discussed BMN 307 and answered questions about the proper human dosing

25   level, confirming that the proper dose could not be determined "until we get to human clinical

26   trials":

> There's still a lot of learning from valrox to PKU gene therapy program.
> We'll go into this in a little bit more detail at R&D Day.  ***But the short version is
> that we won't really know what the effective dose in humans is until we get to***

*human clinical trials. And we know that the amount of liver transduction is influenced by the amount of dosing you give.* So a lot of this is TBD.

61.     On October 23, 2019, BioMarin announced business and financial results for its third quarter ended September 30, 2019. The Company's press release issued on October 23, 2019, revealed that "[o]n September 26, 2019, the Company submitted a [clinical trial application] CTA with the medicines and Healthcare Products Regulatory Agency (MHRA) in the U.K." and again highlighted BMN 307's favorable "preclinical data."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS

62.     The Class Period begins on November 14, 2019, when Defendants discussed BMN 307 at BioMarin's 2019 R&D Day for investors and analysts in New York City. Defendants Fuchs, Bienaimé, and Cardon, as well as other BioMarin senior executives, all attended this investor conference and presented information about BioMarin's product development and business. Cardon discussed BioMarin's PKU "franchise play," updated investors on the status of BMN 307, and confirmed that pre-clinical trials were complete:

Last year, just as a very brief recap, I spent some time to walk through, in some detail, the *preclinical data that led us to this program*. I described *complete phenylalanine normalization in our mouse models out to the lifespan of those mice, which was 80 weeks*. We described treatment effects that were, again, completely normalizing in both males and females. And we described that the results of that normalization was a correction of key neurotransmitters, not just in plasma. But in the brain, which was really exciting and the first time, I think, someone had shown that for PKU.

So these are the data that we went through in some detail. And I'm sure there – the slides and the material are available from last year's presentation. What have we been doing in the past year and where are we now is the question. Well *we finished the nonhuman primate studies, we've got our safety. Our toxicology is done. Our efficacy is completed.* We spent most of our time interacting with regulatory and payer groups and on manufacturing. So we've had some really positive pre-IND and European Health Authority scientific meetings. Importantly, those interactions have been very supportive of the design we have put forward.

*      *      *

So the clinical trial will be an observational study. We call that PHEnom. The first patients have been enrolled already in our observational study. Those patients will roll into the gene therapy interventional. Again, one treatment study, which we call PHEarless. That will be – that interventional study will have 2 components. It will be – *we'll start at an agreed dose and we will dose escalate*. And then we will expand those cohorts as appropriate when they meet certain criteria. So that's effectively the design.

So the summary of where we are with our IND? *We finished our nonhuman primate and mass GLP studies.* Really pleased with the manufacturing campaign. It's done for the entire – *whatever the dose cohort we end with, we are ready*. A number of succesdful regulatory interactions with a broad number of groups. And it's really helped us to align on the plan for the overall program. We announced in September that we submitted our CTA to the U.K.

I can tell you today, we received very positive initial comments back from that CTA just a few weeks ago. We're very confident that we'll clear the CTA this year. And we'll be right on track as we declared to dose first patients early next year. We'll – *our IND submission on the back of that CTA is imminent*. We'll have this – that this year. So all on track with PKU. Great regulatory. Really happy with the manufacturing side. And that study is ready to go.

63.   During the Q&A portion of the conference, Fuchs and Cardon answered questions about BMN 307's IND, the Phase I/II study, and BMN 307's durability in the mouse studies:

*Analyst*: [O]n the PKU potentially registrational Phase I/II. Can you give us maybe a little bit more details on your interactions with the regulators as to that trial design? In particular, how long, how many patients and what proportion of patients will need to get to Phe normalization in order for it to support registration? . . .

*Fuchs*: So how many patients is going to be *driven by the amount of dose escalation that has to occur* on the one hand. And so it's a fairly traditional dose escalation trial. But once an active dose is found and criteria for that are in the protocol, they'll be covered [ph] expansion. Then patients will be followed, I think, for a year, I'm going to look at Jeff, to document the durability of expression of the transgene and the maintenance of phenylalanine correction law and normal diet. The numbers that we've discussed with the health authorities for supporting registration are also informed by a consideration. *We may want to take more than one dose level forward*.

So we'll expand at the first sign of Phe correction. And *we will consider, if safe, escalating to a higher dose and expanding that as well*. And basically, the first dose that gets across the finish line will trigger initiation of registration applications and *could potentially be followed by filing for a higher dose*. Underneath all of that, by the way, are our potential durability considerations that may take years to work out. And we don't want to hold up the program's registration while we sort out long-term – long-long-term durability considerations. So that's what should happen on the sample size and time considerations. Then, Lon, you want to take over?

*          *          *

*Analyst*: . . . *[C]an you just comment maybe a little bit more on durability considerations for PKU?* And I guess in the context of what you saw with valrox, how you think about durability and you think about construct and you think about steroids potentially in that study. . . .

*Cardon*:        *Well so durability.* So we've got a secreted protein with valrox versus an intracellular one. So we need to see what that's going to look like. *The mouse data looked great as far out as the eye could see in terms of durability.* I think – will there be variability, will there be – I think that's going to be biology with this. But I don't know that the lessons of valrox will translate directly because

of the different construct.  The capsid is one thing, transduction – but the construct itself that's going in.  Steroids.  Do you want to talk about thinking on steroids, Hank?

64.     In closing the investor R&D Day, Bienaimé addressed the PKU franchise, expressing that:

> [W]e believe PKU gene therapy will have also a ***significant impact in increasing that PKU franchise***.
>
> So just wanted to add in one item also on Palynziq, regarding Kuvan generics that are likely to be on the market in about a year from now, in the U.S. In Europe, we have protection until 2024.  But I think compared to the usual generic erosion and impact on a brand, what I want to emphasize is that we might lose some adult PKU patients to Kuvan generics.  But ***these patients are not lost forever to BioMarin***.  We will very likely to get some of them back on Palynziq down the road.  And hopefully, ***we'll get all of them treated with gene therapy*** down the road.

65.     Following the 2019 R&D Day, Defendants issued a press release discussing the presentation and the BMN 307 program update they had provided:

> BioMarin shared ***pre-clinical data of its investigational gene therapy*** program for PKU using an AAV5 PAH vector, which ***demonstrated lifetime Phe corrections in mouse models***.  Mouse coat color is a readily detectable biomarker of therapeutic response, and the coat color of all of the mice treated with BMN 307 changed from light brown, evidence of high Phe levels, to black, evidence of therapeutic activity.   Treated mice showed normalized Phe levels sustained ***through 80 weeks***, associated with normalization of circulating neurotransmitter levels, which are involved in neurological characteristics of human PKU.
>
> BioMarin plans to file an investigational new drug application (IND) for BMN 307 with the FDA in the second half of 2019.

66.     Defendants' statements on November 14, 2019 (¶¶62-65), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading. Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)     Contrary to Defendants' positive statements in ¶62 that "***The mouse data looked great as far out as the eye could see in terms of durability***," as Defendants admitted beginning in its September 5, 2021 press release and as further disclosed thereafter (¶¶12, 14-15, 106, 109-110, 112-120), that they had observed liver tumors in a pre-clinical study to test BMN 307's durability at 52 weeks in 85% of mice dosed at the 2e14 Vg/kg level;

1          (b)      Contrary to Defendants' assurances on November 14, 2019 (¶62) that "*we*

2 *finished the nonhuman primate studies, we've got our safety*.  *Our toxicology is done.  Our*

3 *efficacy is completed*," Defendants failed to disclose that, as admitted beginning on September 5,

4 2021 (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-

5 clinical study in 85% of mice dosed at the 2e14 Vg/kg level;

6          (c)      Despite Defendants' representations in ¶62 that the "*preclinical data that*

7 *led us to this program*" – which according to Defendants was completed before the start of the

8 Class Period in the first half of 2019 (¶¶7, 53, 57, 62-63) – showed "*complete phenylalanine*

9 *normalization in our mouse models out to the lifespan of those mice, which was 80 weeks*,"

10 Defendants had observed tumors in a pre-clinical durability study at 52 weeks (¶¶12, 14-15, 106,

11 109-110, 112-120);

12          (d)      Having acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80)

13 that they could not know what the correct human dose would be "until we get to human clinical

14 trials" because the "*first goal [of the clinical trials] is to find the dose*," "*you can only find that*

15 *out when you go into human[ clinical trials]*," and "*we may have to go to a higher dose as well*,"

16 Defendants omitted to disclose, and otherwise had no basis to discuss "*dose escalat[ion]*" and the

17 "*dose cohort*" in BMN 307's human clinical trials without disclosing that they had observed

18 tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307.  (¶¶62-63).  Similarly, in stating

19 that "*we will consider if safe, escalating to a higher dose and expanding that as well*," (¶63)

20 Defendants knew but failed to disclose that in pre-clinical studies higher doses had caused liver

21 tumors in mice; and

22          (e)      While Defendants discussed BioMarin's PKU franchise and explained that

23 "we believe PKU gene therapy will have also a *significant impact in increasing that PKU*

24 *franchise*," (¶64) Defendants failed to disclose that they had observed tumors in a pre-clinical

25 study of BMN 307, BioMarin's next generation gene therapy and next step in the Company's "pills

26 to proteins to gene therapy" strategy.

27

28

67.     Defendants' statements on November 14, 2019, (¶¶62-65) which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

68.     On January 9, 2020, defendant Bienaimé presented at the *Goldman Sachs Healthcare CEOs Unscripted: A View from the Top* investor conference.  Bienaimé expressed his excitement about BMN 307, noting that "using a very well-established PKU mouse model . . . *we show there is no safety issue*."

69.     On January 13, 2020, BioMarin announced that BMN 307 had been approved for clinical trials and the Company "expects to start dosing patients in PHEARLESS, a Phase 1/2 study, in the first quarter of 2020," which "will evaluate the *safety, efficacy, and tolerability* of a single intravenous administration of BMN 307 in patients with PKU.  The study consists of a dose-escalation phase, followed by a cohort expansion phase once an initially efficacious dose has been demonstrated."

70.     Also on January 13, 2020, while addressing analysts and investors at the J.P. Morgan Healthcare Conference, defendant Bienaimé discussed the human clinical studies:

> So just a few words about our, again, next PKU – I mean next gene therapy in PKU products, BMN 307, gene therapy for PKU.  We just announced today that U.S. and the U.K. cleared the path to start the clinical trial.  *So we are implementing 2 study.  The first one, the 902 study, the PHEnom study, which is an observational study in patients with PKU, which started a few months ago.  And now we are about to start the 201 or PHEarless trial, which is going to be a dose escalation, dose selection study with a Part B expansion anticipated in the second half of this year*.  This study could potentially be the registration enabling Phase I/II study.  And something we also want to emphasize that none of our competitors are able to do is that we are doing our first-in-human trial here for PKU gene therapy at commercial scale with a commercial facility.  So there won't be any need to do any kind of bridging trial between early Phase I/II trial, the pivotal trial.  We are right away starting with commercial scale, which I said earlier, can right now generate up to 10,000 patient doses per year.

71.     On February 26, 2020, BioMarin announced results for 4Q 2019.  The Company's press release issued that same day quoted defendant Bienaimé providing an update on BMN 307:

> Building on the success of our phenylketonuria (PKU) franchise with Palynziq and Kuvan, we announced in January that both the United States and the United Kingdom health authorities had given the go-ahead to *start dosing patients* with PKU with our BMN 307 gene therapy in a Phase 1/2 study.  We plan to treat patients with BMN 307 in the first quarter using product made at commercial scale from our award-winning gene therapy manufacturing facility. . . .

*    *    *

***Preclinical data with BMN 307 demonstrated a lifetime Phe correction sustained at 80 weeks in mouse models***.  BMN 307 is an AAV vector containing the DNA sequence that codes for the phenylalanine hydroxylase enzyme that is deficient in people with PKU.

72.    That same day, on February 26, 2020, Defendants held a conference call to discuss its 4Q 2020 business and financial results.  Among others, defendants Bienaimé and Fuchs participated in the investor conference call, during which Fuchs discussed the status of BMN 307:

> Turning now to BMN 307, our investigational gene therapy for phenylketonuria.  We expect to start enrolling patients in the PHEarless Phase II study, which is a ***dose-escalation***, dose-selection study later this quarter, with an expansion arm expected in the second half of the year.  This study could potentially be registration enabling past that expansion as we're conducting it with material manufactured using a commercial-ready process to derisk this program and facilitate rapid clinical development and registration.  ***We are excited about the prospect of BMN 307 as it represents a potential third treatment for phenylketonuria in our franchise; and a second gene therapy development program, leveraging our learnings and capabilities from valrox***.

73.    Defendants' statements on January 9, 2020, January 13, 2020, and February 26, 2020, (¶¶68-72), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)    Contrary to Defendants' assurances in ¶¶68-69 that "***using a very well-established PKU mouse model . . . we show there is no safety issue***" and otherwise discussing "***safety, efficacy, and tolerability***" issues, Defendants failed to disclose that, as admitted beginning on September 5, 2021 and as further disclosed thereafter (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-clinical study in 85% of mice dosed at the 2e14 Vg/kg level;

(b)    Having later acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80) that they could not know what the correct human dose would be "until we get to human clinical trials" because "***first goal [of the clinical trials] is to find the dose***," "***you can only find that out when you go into human[ clinical trials]***," and "***we may have to go to a higher dose as well***," Defendants omitted to disclose and otherwise had no basis to discuss "***dosing patients***" and

the "*dose-escalation phase*" of the BMN 307 clinical trials (¶¶70-72) without disclosing that in pre-clinical studies they had observed tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307; and

(c)     Defendants had no reasonable basis in fact to support their positive, but misleading statement concerning BioMarin's PKU franchise and expressed "*excite[ment] about the prospect of BMN 307 as it represents a potential third treatment for phenylketonuria in our franchise*" (¶72), because Defendants failed to disclose that they had observed tumors in a pre-clinical study of BMN 307, (¶¶12, 14-15, 106, 109-110, 112-120) BioMarin's next generation gene therapy and next step in the Company's "pills to proteins to gene therapy" PKU franchise strategy.

74.     Defendants' statements on January 9, 2020, January 13, 2020, and February 26, 2020, (¶¶68-72) which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

75.     On April 29, 2020, BioMarin announced business and financial results for the first quarter of 2020.  In the release, the Company addressed the status of BMN 307, which according to the Company's Form 10Q, *transitioned from the "Preclinical" stage to the "Clinical Phase 1/2" stage* following IND approval in 1Q 2020.[10]  Defendants further highlighted the favorable pre-clinical data that supported its clinical IND application:

> **Preclinical data** with BMN 307 demonstrated a lifetime Phe correction sustained at **80 weeks in mouse models**.  BMN 307 is an AAV vector containing the DNA sequence that codes for the phenylalanine hydroxylase enzyme that is deficient in people with PKU.

76.     On June 4, 2020, Fuchs addressed investors and analysts about BMN 307 at the Jefferies Healthcare Conference.  In response to analyst questions about BMN 307, the lifetime of the mice in BioMarin's preclinical study, and BMN 307's durability, Fuchs explained:

> **Moderator:**   Fair.  **Let's move on to PKU gene therapy**.  So in the animal's mouse model, **you show sustained – you have a few corrections in the lifetime of the mice**.  Have you measured – what was the enzyme activity levels of treatment within the mouse model from baseline? The reason why I'm asking that question is, if we assume that in humans, enzyme activity levels would decline over time

---

[10]   *Compare, e.g.*, BioMarin's Form 10Q for 3Q 2019 *with* BioMarin's Form 10Q for 1Q 2020.

similar to Factor VIII levels, then I'm kind of wondering what you – what would you think about the minimum PAH activity levels required in the liver for [Fe] correction in humans?

**Fuchs:**        Well, I think while the Factor VIII level declines in humans over, now, a relatively longish period of time, the clinical significance of those declines is unclear given the ADR rate that we see.   And similarly, I think with phenylketonuria, what we're going to care about mostly is the blood phenylalanine levels.   And here, we have a bit of an advantage, that is that ***you can overshoot an enzyme expression without apparent toxicity***, will cause clinically relevant hypophenylalaninemia from having too much phenylalanine hydroxylase in your liver.

And I think there are some other things that are going to make comparison between ROCTAVIAN clinical data and PKU clinical data a little bit more difficult than just the fact that we're measuring, in one case, the transgene product, in another case, the substrate of the transgene product.

I think also just the state of liver health has the potential to be different between the 2 populations.  And so I think ***we should approach the 307 data with an open mind as to durability.  The ENU2 mice data are very encouraging and very consistent with what you see in the field in general.***

77.     Defendants' statements on April 29, 2020 and June 4, 2020 (¶¶75-76), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)     Contrary to Defendants' positive statements in ¶76 that investors should approach the clinical data "***with an open mind as to durability***" because "***[t]he ENU2 mice data are very encouraging and very consistent with what you see in the field in general***," as Defendants admitted on September 5, 2021, and further disclosed thereafter (¶¶12, 14-15, 106, 109-110, 112-120), a pre-clinical study to test BMN 307's durability resulted in liver tumors at 52 weeks in 85% of mice dosed at the 2e14 Vg/kg level;

(b)     Although Defendants recognized that BMN 307 had transitioned from the "***Preclinical***" stage to the "***Clinical Phase 1/2***" stage following IND approval in 1Q 2020 (¶75), Defendants failed to disclose that, as Defendants admitted beginning on September 5, 2021 (¶¶12, 14-15, 106, 109-110, 112-120), a pre-clinical study to test BMN 307's durability resulted in liver tumors at 52 weeks in 85% of mice dosed at the 2e14 Vg/kg level; and

(c)     Despite Defendants' representations in ¶75 that the "**preclinical data**" – which according to Defendants, pre-clinical studies were completed before the start of the Class Period in the first half of 2019 (¶¶7, 53, 57, 62-63) – "demonstrated a lifetime Phe correction sustained at 80 weeks in mouse models" Defendants had observed liver tumors in a pre-clinical mouse study at 52 weeks (¶¶12, 14-15, 106, 109-110, 112-120).

78.     Defendants' statements in April and June 2020 (¶¶75-76), which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

79.     On August 4, 2020, BioMarin released its second quarter 2020 (¶¶75-76) business and financial results.  Defendants held a conference call with investors and analysts that same day to discuss the Company's 2Q 2020 business and financial results.  During the investor conference call, which was attended by defendants Bienaimé and Fuchs, among others, Fuchs stated:

> Moving onto BMN 307, our investigational gene therapy for PKU.  We're continuing to prepare new sites, and depending on the ongoing impact of COVID-19, we believe, we could begin dosing in the Phase I/II study, named PHEarless, later in the third quarter.  *We're excited about the prospect of BMN 307 as it represents the potential third PKU treatment option in our PKU franchise and a second gene therapy development program leveraging our learnings and capabilities from ROCTAVIAN.*

80.     On August 13, 2020, during a Canaccord Genuity Growth Conference, Fuchs addressed analysts and investors, stating:

> The trial that we're implementing has potential be a Phase I/II/III trial.  We're using material from the commercialized facility.  So if we are able to demonstrate effectiveness to a conclusive degree, we will have all of the bells and whistles of a registration trial.  It's a Phase I/II in the sense that *there's a dose escalation and expansion phase*.  So *the first goal is find the dose*.  We're starting at a dose that we think has got a reasonably good shot at being effective.  It's been effective preclinically, but *we may have to go to a higher dose as well*.  And *you can only find that out when you go into humans*.  The primary endpoint of the study is going to be blood phenylalanine levels.
>
> The target of effectiveness is to basically get everybody in a normal range.  *There is no concern really about overshoot*.  And we've demonstrated with our Palynziq that you can cause hypophenylalaninemia without significant symptoms.  So the ideas is, load them up as much as you can get the fee down to as normal as you can and allow diet to be normal.  And that should be the registration package.

81.     On October 6, 2020, the Company announced it had dosed the first participant in its Phase 1/2 trial evaluating BMN 307:

The study is assessing the ***safety, efficacy, and tolerability*** of a single intravenous administration of BMN 307.  It consists of a dose-escalation phase, followed by a cohort expansion phase once an initial efficacious dose has been demonstrated.

82.     Defendants' statements on August 4, 2020, August 13, 2020, and October 6, 2020 (¶¶79-81), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)     Contrary to Defendants' statements in ¶81 about BMN 307's clinical trials assessing "***safety, efficacy, and tolerability***," Defendants failed to disclose that, as admitted beginning on September 5, 2021 and further disclosed thereafter (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-clinical study in 85% of mice dosed at the 2e14 Vg/kg level;

(b)     Having acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80) that they could not "really know what the effective dose in humans is until we get to human clinical trials" because "***first goal [of the clinical trials] is to find the dose***," "***you can only find that out when you go into human[ clinical trials]***," and "***we may have to go to a higher dose as well***," Defendants omitted to disclose, and otherwise had no basis to represent that the pre-clinical dosing had "***been effective preclinically***" or discuss "***dosing***" and "***dose escalation***" of the BMN 307 clinical trials without disclosing that they had observed tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120); and

(c)     While Defendants discussed BioMarin's PKU franchise and expressed "***excite[ment] about the prospect of BMN 307 as it represents the potential third PKU treatment option in our PKU franchise and a second gene therapy development program***," (¶79) Defendants failed to disclose that they had observed liver tumors in a pre-clinical study of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120), BioMarin's next generation gene therapy and next step in the Company's "***pills to proteins to gene therapy***" strategy.

83.     Defendants' statements in August and October 2020, which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

84.     On October 2, 2020, the Company announced that the FDA has granted Fast Track designation to BMN 307, an investigational gene therapy for the treatment of individuals with PKU.  "We are looking forward to working closely with the FDA, as well as other health agencies, *to evaluate the safety and efficacy of this promising investigational gene therapy* as we continue our unwavering 15-year commitment to advance the standard of care for people with PKU."

85.     On November 5, 2020, BioMarin released its business and financial results for 3Q 2020.  The Company's press release issued that same day provided an update on BMN 307:

**Key Program Highlights**

- **BMN 307 gene therapy product candidate for phenylketonuria (PKU):** On September 24, 2020, the Company announced that it ***began dosing participants*** in PHEARLESS, the Phase 1/2 study of BMN 307.  Both the FDA and EMA granted BMN 307 Orphan Drug Status.  Additionally, the FDA has granted Fast Track status to BMN 307.  Product for use in the Phase 1/2 study was made at commercial scale from BioMarin's award-winning gene therapy manufacturing facility.

86.     The Company's Form 10Q for 3Q 2020, filed that same day, provided an additional update and summary on BMN 307 and highlighted that "[i]n September 2020, we announced that *we began dosing participants* in PHEARLESS, the Phase 1/2 study of BMN 307 our gene therapy candidate for PKU."

87.     On November 17, 2020, at a Stifel Virtual Healthcare Conference, Fuchs addressed investors and analysts and discussed BMN 307.  Without refuting or correcting the moderator's statement that the "***PKU preclinical data in the ENU2 mouse, it looks awesome***" Fuchs addressed comparisons of BMN 307 with Homology's competing PKU gene therapy product:

***Dose too low*** [for Homology], need more.  Got to get to a much more effective level of fee reduction for diet liberalization to be even plausible or meaningful.  And it's – I'm a little puzzled by the doses that they appear to select appear to be doses that are lower than the dose that was incompletely effective.  So that's an ***interesting strategy, certainly going to favor safety***.  Although even that wasn't crystal clear from the lower dose.

So I'm a little confused by the game plan there.  I think for us, normal fee, normal diet is kind of the coin of the realm because we can get more than half of the population down in normal fees with liberalized IO with Palynziq.  So if you want gene therapy and inherent uncertainties of gene therapy and the prophylactic steroids, you're going to have to do better than the current standard of care.  So I was struck by how marginal their data were.

Now maybe they can't make more or maybe they're concerned that more is going to be toxic, and we'll just have to see where we get to in terms of total dose for ROCTAVIAN.  I mean for 307, the good news, we have a lot of capsid experience.  ***So in so far as the big safety problems that people have been observing are pretty much capsid-related initially.  We feel pretty good about that. Now if we have to go to a higher dose, that will be a new zone for us.***

88.     On November 18, 2020, at a Jefferies Virtual London Healthcare Conference, Bienaimé address investors and analysts about BMN 307, stating:

BMN 307 gene therapy for PKU is in the clinic.  ***We have already treated 2 patients with the goal of achieving normalized Phe levels as we did in PKU mice***.

89.     Defendants' statements on October 2, 2020, November 5, 2020, November 17, 2020, and November 18, 2020 (¶¶84-87), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)     Contrary to Defendants' adoption in ¶87 of the moderator's statement that "***PKU preclinical data in the ENU2 mouse, it looks awesome***," as Defendants admitted beginning on September 5, 2021 and further disclosed thereafter (¶¶12, 14-15, 106, 109-110, 112-120), Defendants observed liver tumors in a pre-clinical study at 52 weeks in 85% of mice dosed at the 2e14 Vg/kg level to test BMN 307's durability;

(b)     Contrary to Defendants' statements in ¶84 concerning using the clinical trials to "***evaluate the safety and efficacy of this promising investigational gene therapy***," Defendants omitted that, as admitted at the end of the Class Period (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-clinical study in 85% of mice dosed at the 2e14 Vg/kg level;

(c)     Despite Defendants' comparison between the patients dosed in clinical trials and "***the goal of achieving normalized Phe levels as we did in [pre-clinical] PKU mice***"

(¶88), Defendants had observed liver tumors in a pre-clinical durability study, when according to Defendants pre-clinical studies were completed before the start of the Class Period in the first half of 2019 (¶¶12, 14-15, 106, 109-110, 112-120);

(d)     Having acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80) that they could not know what the correct human dose would be "until we get to human clinical trials" because "*first goal [of the clinical trials] is to find the dose*," "*you can only find that out when you go into human[ clinical trials]*," and "*we may have to go to a higher dose as well*," Defendants omitted to disclose, and otherwise had no basis to discuss "dosing participants" of the BMN 307 clinical trials without disclosing that they had observed tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120); and

(e)     While Defendants discussed BioMarin's PKU franchise and compared BMN 307 to Homology's competing gene therapy, addressing "big safety problems that people have been observing" in those competing gene therapy products (¶87), Defendants failed to disclose that they had observed tumors in a pre-clinical study of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120), BioMarin's next generation gene therapy and next step in the Company's "pills to proteins to gene therapy" strategy.

90.     Defendants' statements in October and November 2020 (¶¶84-88), which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

91.     On February 25, 2021, BioMarin announced business and financial results for its fourth quarter ended December 31, 2020.  The Company's press release was issued on February 25, 2021, announcing that the "Company *Dose-escalates in PHEarless*."

92.     The press release further described "Key Program Highlights," including as to BMN 307:

- **BMN 307 gene therapy product candidate for PKU:** The Company announced that it *plans to dose escalate in PHEarless*, the Phase 1/2 study of BMN 307 based on encouraging Phe lowering and *safety signals observed in study participants who were treated with the lowest dose*.  Both

the FDA and EMA granted BMN 307 Orphan Drug Status.  Additionally, the FDA has granted Fast Track status to BMN 307.  Product for use in the Phase 1/2 study was made at commercial scale from BioMarin's award-winning gene therapy manufacturing facility.

93.     On February 25, 2021, BioMarin hosted a conference call with investors and analysts to discuss the Company's fourth quarter and full year 2020 business and financial results. Among others, defendants Bienaimé and Fuchs participated in the investor conference call, during which Bienaimé discussed BMN 307:

Starting with BMN 307 gene therapy for PKU, we are pleased to share that *we are moving to the next higher dose in our Phase I/II studies, advancing the third potential treatment modality for our PKU franchise*.  We are encouraged by the Phe lowering and *safety results* observed in the first 2e13 dose cohorts in our Phase I/II study, and we are now ready to *move the next dose of 2e13*, which is similar to the ROCTAVIAN dose.  Based on this early data from the 2e13 cohort and our prior steep dose response experience with ROCTAVIAN, we are optimistic that the 6e13 dose will be our optimal dose.  We will share the next update on the BMN 307 from the dose confirmation phase of this study once we have selected the dose for registration-enabling study.

94.     During the SVB Leerink Global Healthcare Conference held with investors and analysts on February 26, 2021, defendant Bienaimé commented on the BMN 307's human Phase 1/2 study, explaining:

Concurrently, *significant progress* is being made on the next generation of potential commercial products, 307 PKU gene therapy.  Phase II is *moving to a higher dose* based on strong efficacy and safety signals at the low dose.

95.     On March 29, 2021, at a JPMorgan NAPA Valley Forum, Bienaimé addressed investors and analysts and discussed increasing the dose of BMN 307 in human clinical trials:

Finally, in our earlier stage pipeline, we have 5 programs moving forward, including BMN 307, the gene therapy product for PKU.  And I will say that based on *encouraging Phe lowering and safety observed* in the Phase I/II study with BMN 307 with a low dose 2e13 vg/kg, *we are moving to the next higher dose* at 60^13, which is the ROCTAVIAN dose in the Phase III trial.

96.     Defendants' statements on February 25, 2021, February 26, 2021, and March 29, 2021 (¶¶91-95), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)      Contrary to Defendants' assurances in ¶¶92, 95 that there were "***encouraging Phe lowering and safety signals observed in study participants who were treated with the lowest dose***," as Defendants admitted beginning on September 5, 2021 (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-clinical study in which 85% of mice dosed at the 2e14 Vg/kg level;

(b)      Contrary to Defendants' discussion concerning the results of pre-clinical trials and that the "[t]reatment of mice in a validated PKU mouse model with BMN 307 showed a lifetime normalization of Phe and normalized neurotransmitter levels" (¶92), Defendants failed to disclose that, as admitted beginning on September 5, 2021 (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors in a pre-clinical mouse study – which according to Defendants were completed before the start of the Class Period in the first half of 2019 (¶¶62-63);

(c)      Having acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80) that they could not know what the correct human dose would be "until we get to human clinical trials" because "***first goal [of the clinical trials] is to find the dose***," "***you can only find that out when you go into human[ clinical trials]***," and "***we may have to go to a higher dose as well***," Defendants omitted to disclose, and otherwise had no basis to update investors concerning the ***"Company Dose-escalates in PHEarless"*** (¶91), describe their "***plans to dose escalate***," (¶¶91-93) or discuss various observations in the dose escalation study and readiness "***to move the next higher dose***" (¶¶94-95) in BMN 307's human clinical trials without disclosing that they had observed tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120); and

(d)      While Defendants discussed BioMarin's PKU franchise and the "***significant progress*** [] being made on the next generation of potential commercial products, 307 PKU gene therapy," (¶94) Defendants failed to disclose that they had observed tumors in a pre-clinical study of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120), BioMarin's next generation gene therapy and next step in the Company's "pills to proteins to gene therapy" strategy.

97.     Defendants' statements in February and March 2021 (¶¶91-95), which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

98.     On April 29, 2021, BioMarin announced 1Q 2021 business and financial results. Concerning BMN 307, the Company's press release provided that the "***Dose escalation*** in PHEarless, the Phase 1/2 study of BMN 307 continues based on ***encouraging*** Phe lowering and ***safety profile observed in study participants*** who were treated with the lowest dose."

99.     And the Company's Form 10Q for the first quarter of 2021 provided a similar summary of the status of the BMN 307 clinical trials:

> • BMN 307 - In February 2021, we announced that we had ***begun to dose escalate participants*** in PHEarless, the Phase 1/2 study of BMN 307 our gene therapy candidate for PKU based on encouraging Phe lowering and safety signals observed in study participants who were treated with the lowest dose.  Both the FDA and EMA have granted BMN 307 Orphan Drug Status.  Additionally, the FDA has granted fast track designation to BMN 307.  All subjects participating in the PHEarless study are receiving product made at commercial scale from our gene therapy manufacturing facility.

100.    On April 29, 2021, in connection with BioMarin's first quarter 2021 financial and business results, defendants hosted a conference call with investors and analysts.  During the investor call, which was attended by, among others, defendants Bienaimé and Fuchs, Fuchs stated:

> Briefly, on the earlier stage pipeline, ***dose escalation has commenced*** with BMN 307, our investigational gene therapy for phenylketonuria.  ***And the program continues based on the encouraging fee lowering observed with the lower dose that's been tested so far.***

101.    On July 28, 2021, BioMarin announced business and financial results for second quarter 2021.  The press release announcing the results provided an update on BMN 307:

> • BMN 307: ***Dose escalation in PHEarless, the Phase 1/2 study of BMN 307 continues*** based on encouraging Phe lowering and safety profile observed in study participants who were treated with the lowest dose.

102.    The Company's Form 10Q for the second quarter 2021 also provided an update on BMN 307 and the dose escalation in the human clinical trials:

> • BMN 307 - In February 2021, we announced that we had ***begun to dose escalate participants*** in PHEarless, the Phase 1/2 study of BMN 307 our gene therapy candidate for PKU based on ***encouraging Phe lowering and***

***safety signals observed in study participants*** who were treated with the lowest dose. . . .

103.   Defendants' statements on April 29, 2021 and July 28, 2021 (¶¶98-102), and identical statements made throughout the Class Period regarding BMN 307, were materially misleading when made and omitted to disclose material facts necessary to not make the statements made misleading.  Defendants knew or recklessly disregarded, but failed to disclose until the end of the Class Period, the following:

(a)     Contrary to Defendants' assurances in ¶¶100, 102 that they were observing "***encouraging Phe lowering and safety signals observed in study participants who were treated with the lowest dose***," as Defendants admitted beginning on September 5, 2021 (¶¶12, 14-15, 106, 109-110, 112-120), they had observed liver tumors at 52 weeks in a pre-clinical study in 85% of mice dosed at the 2e14 Vg/kg level; and

(b)     Having acknowledged on August 1, 2019 (¶60) and August 13, 2020 (¶80) that they could not know what the correct human dose would be "until we get to human clinical trials" because "***first goal [of the clinical trials] is to find the dose***," "***you can only find that out when you go into human[ clinical trials]***," and "***we may have to go to a higher dose as well***," Defendants omitted to disclose, and otherwise had no basis to update investors concerning the "***dose escalation***" and that Defendants "***had begun to dose escalate participants***" in BMN 307's human clinical trials (¶¶98-102) without disclosing that they had observed tumors at 52 weeks in 6 of 7 mice at higher doses of BMN 307 (¶¶12, 14-15, 106, 109-110, 112-120).

104.   Defendants' statements in April and July 2021 (¶¶98-102), which were false and misleading when made, had a direct effect on BioMarin's stock price, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

## DEFENDANTS' FRAUDULENT CONDUCT BEGINS TO BE REVEALED

**BioMarin Discloses Liver Tumors Observed in Pre-Clinical Studies and the FDA Places Clinical Hold on Trial Due to Serious Safety Concerns**

105.   On September 2 and 3, 2021, in the wake of patient deaths and safety issues linked to experimental gene therapies involving AAV deliver, the FDA's Cellular, Tissue and Gene Therapies Advisory Committee held a conference to discuss its concerns and the need for

transparency on safety issues in preclinical studies.  The discussion topics included oncogenicity risks due to vector genome integration and safety issues identified during preclinical and/or clinical evaluation.

106.    Two days later, on Sunday, September 5, 2021, BioMarin announced that the FDA placed a clinical hold on phase I/II testing of its BMN 307 gene therapy candidate after pre-clinical data showed mice treated with the highest dose of BMN 307 had developed liver tumors after 52 weeks:

> The company carried out this ***pre-clinical study to understand the durability of BMN 307*** activity in mice bearing two germline mutations, which may predispose the mice to the development of malignancy.  One mutation eliminated the PAH gene that's missing in PKU and the second rendered the animals immunodeficient.  ***Of 63 animals treated, six of seven animals administered BMN 307 at the highest dose group (2e14 Vg/kg) had tumors on liver necropsy 52 weeks after dosing*** with evidence for integration of portions of AAV vector into the genome.  No lesions were observed in any mice at 24 weeks. ***Five of these animals had adenomas and one had a hepatocellular carcinoma (HCC)***.

107.    On September 7, 2021, the next market trading day, shares of BioMarin stock plummeted as the market reacted to the disclosure of the tumors observed in the pre-clinical studies, falling $7.14 per share, or over 8.4%, from the previous trading day's close.

108.    However, because investors still did not know the full truth about BMN 307, and the liver tumors observed in pre-clinical studies, including that the clinical hold would last several quarters and the FDA would require additional data from non-clinical trials, the price of BioMarin stock remained artificially inflated.

109.    At the September 10, 2021, Morgan Stanley Global Healthcare Conference with analysts and investors, Bienaimé and Cardon addressed BMN 307, the clinical hold, and the observed liver tumors.  Bienaimé revealed:

> So turning on to the news earlier this week, BMN 307, our investigational gene therapy for PKU, was placed on a clinical hold based on interim safety findings from ***preclinical rodent trial***.  It was a non-GLP pharmacology study in immunodeficient mice.  While we do not believe that these critical findings with BMN 307 are suggesting a significant risk to humans, we are being prudent and investigating those findings thoroughly.  ***These findings were specific to BMN 307 to this mouse model***, and we do not believe that this suggests a risk to any of our other gene therapy programs.  We are working with the FDA and other health authorities, and we will communicate next steps when available.  So we will keep you posted as we learn more.

110.    And Defendant Cardon discussed the liver tumors observed in the pre-clinical "pharmacology study of durability":

> . . . What *we found after 52 weeks* of taking down the animals is that 6 of the 7 animals administered in the highest dose of 2e14 had *tumors on liver necropsy.  Five of those had adenomas, 1 had hepatocellular carcinoma.*  And vector integration associated with those findings was observed in that high dose, and only in that high dose.
>
> Now all of these findings – all of our preliminary findings, all of these are studies are on – the study is ongoing and our analyses are ongoing.  *They've all been observed.  All of these effects have been observed in other mice studies previously in other AAV trials.*  But we promptly took steps to mitigate the risk and share findings with the global health authorities as soon as we saw them.  And they subsequently put us on clinical hold for our PHEARLESS PKU program, which has dosed 4 patients to date.  We – there are many reasons to think that these *preclinical findings* are not suggestive of a significant risk to humans, but we're being really prudent and investigating these findings thoroughly.

111.    Just weeks after Defendants disclosed that they had observed liver tumors in a pre-clinical durability study in mice, and in the wake of the clinical hold, defendant Cardon, who had introduced investors to BMN 307 as the "main event" at the 2018 R&D Day and had assured investors that "*[t]he mouse data looked great as far out as the eye could see in terms of durability*" (¶¶52,63), disappeared from the Company.

112.    Bienaimé addressed investors and analyst at the JPMorgan US All Stars Conference, held virtually on September 22, 2021.  During the investor conference, Bienaimé discussed the pre-clinical durability study and attempted to downplay the clinical hold and the significance of the liver tumors, focusing on the high dosage that led to the tumors:

> So these are the facts. *And there have been many clinical holds by the FDA in many indications and modalities, some of them in gene therapy, and most of them have been removed.* It's too early to tell to give you a time line on if and when the hold can be removed. We've got to meet for the first time or talk to the FDA in October about this. And also, what's interesting, though, is that -- by the way, the finding was also on a dose is much higher. It was [2e14], which is *much higher than the dose that we treat our patients so far.* The highest dose we used was 6e13. And we are -- with what's kind of ironic is that we are starting to see some clear signs of efficacy at 6e13 in PKU, which that is hopefully we will be going to be able to proceed in the future.

113.    On October 27, 2021, following Cardon's abrupt departure from the Company, BioMarin announced its third quarter 2021 business and financial results.  The Company's press release address the clinical hold:

***Earlier-stage Development Portfolio (BMN 307, BMN 255, BMN 331, BMN 351, DiNA-001, Allen Institute Collaboration, Deep Genomics)***

- Details for BioMarin's virtual R&D Day on November 30, 2021 will be made available over the coming weeks.  The Company plans to share an in-depth review of multiple early-stage pipeline programs showcasing next potential IND candidates.

- BMN 307 gene therapy product candidate for PKU: The FDA placed a clinical hold on PHEarless, the Phase 1/2 study evaluating BMN 307, an investigational AAV5-phenylalanine hydroxylase (PAH) gene therapy, in adults with phenylketonuria (PKU).  The hold was based on ***pre-clinical study findings from a model designed to understand the durability of BMN 307 activity*** in mice bearing two germline mutations, one rendering the mice immunodeficient.  The clinical significance of these findings is being evaluated to assure safe and appropriate use of BMN 307.  To date, findings appear specific to mice and have no known translatability to humans or other gene therapy vectors.  BioMarin is working with health authorities to address the clinical hold and resume study investigations, as appropriate.

114.   And the Company's Form 10Q for the third quarter of 2021 provided similar information on the clinical hold and BMN 307:

***Continued Emphasis on Research and Development***

*   *   *

- BMN 307 - our gene therapy product candidate for PKU.  In September 2021, ***the FDA placed a clinical hold on PHEarless***, our Phase 1/2 study evaluating BMN 307, an investigational AAV5-phenylalanine hydroxylase gene therapy, in adults with PKU.  The hold was ***based on pre-clinical study findings from a model designed to understand the durability of BMN 307 activity in mice*** bearing two germline mutations, one rendering the mice immunodeficient.   The clinical significance of these findings is being evaluated to assure safe and appropriate use of BMN 307.  To date, findings appear specific to mice and have no known translatability to humans or other gene therapy vectors.   We are working with health authorities to address the clinical hold and resume study investigations, as appropriate.

115.   And the Credit Suisse Healthcare Conference held for BioMarin investors and analysts on November 10, 2021, Bienaimé downplayed the seriousness of the clinical hold:

. . . We believe the findings that we over observed with the 307 PKU gene therapy were inherent to the mouse model that was used.  They were double knockout, mice that have no immune system.  Actually, we've done the experiment with also high dose of ROCTAVIAN with the – or a construct that is extremely similar to ROCTAVIAN in terms of the vector and the promoter.  And at 1 year, we had no issue here with the mice.

At the same time, ***what was observed with the PKU of mice here is not something that is new***.  And the issue of carcinogenicity, rodents has been documented and talked about for many, many years in the AAV field.

And actually, this was evidenced when the FDA had their Advisory Committee, where, I think, the consensus was that any of the findings in mice have no translatability to humans.  ***Actually, even, I think, one of the experts say that if you let the mice live long enough, they all will develop cancer*** because they have longer telomeres than the humans, so I'm getting into the technical details.

116.    On November 30, 2021, BioMarin hosted a virtual R&D Day with investors and analysts.  Among others, defendants Bienaimé and Fuchs participated in the investor conference, during which Defendants addressed the FDA's clinical hold, continuing to downplay the seriousness of tumors and the significance of the hold, and again expressing that they "hope to be off clinical hold by the end of the First Quarter":

*Kevin Eggan, Group VP & Head of Research & Early Development*:

. . . So we've reviewed the information request from the FDA and have prepared our responses.  We intend to submit them at the beginning of the year, and we hope to be ***off clinical hold by the end of the First Quarter***.  Now of course we're still awaiting our discussion and engagement with the FDA.  So we remain uncertain about precisely what will be required.  ***But they have not, at this time, requested further experiments***.  Now one of the reasons why I have increasing confidence that we will come off of hold is that our careful quantitative analysis of the tumor samples indicates that, in most cases, only a few tumor cells, a few percent of tumor cells in each one of those samples actually shows evidence for integration.

117.    At a January 6, 2022 Goldman Sachs Healthcare CEOs Unscripted Conference: A View from the Top, Bienaimé address investors and analysts, stating:

. . . We also are still very excited about PKU gene therapy, BMN 307.  As you know, ***we had this advance in critical data in some rodents.  So the clinical trial was put on clinical hold.  We believe – we're confident that actually – we hope and we're confident that we'll – the clinical hold will be lifted this quarter because we have no evidence to suggest that the [critical] signal that we saw in rodents, and that actually all those have seen in rodents, will translate into humans.***

And we are about to push the button to send our official response to the FDA, but – and ***the FDA has not required any additional studies***.  So ***we're confident that – we are optimistic that the clinical hold will be lifted***.

118.    Finally, on February 17, 2022, Defendants issued a press release titled *BioMarin Provides Updates on Progress in Gene Therapy Programs*, in which the Company revealed that the FDA would not be lifting the clinical hold on BMN 307, and had instead made "additional

requests . . . for information needed to resolve the clinical hold of the PHEARLESS Phase 1/2 study of BMN 307." This additional information includes "*data from additional non-clinical studies* to assess the theoretical oncogenic risk to human study participants, which is expected to take *several quarters*."

119. On February 23, 2022, BioMarin announced its fourth quarter 2021 business and financial results. In the press release announcing the results, and the subsequent conference call with investors and analysts, Defendants addressed the ongoing clinical hold, and the FDA's request for additional data from non-clinical studies:

- BMN 307 gene therapy product candidate for PKU: In September 2021, the FDA placed a clinical hold on PHEarless, the Phase 1/2 study evaluating BMN 307, an investigational AAV5-phenylalanine hydroxylase (PAH) gene therapy, in adults with phenylketonuria (PKU). The hold was *based on pre-clinical study findings from a model designed to understand the durability of BMN 307 activity in mice* bearing two germline mutations, one rendering the mice immunodeficient. In February 2022, the *FDA requested data from additional non-clinical studies* to assess theoretical oncogenic risk to human study participants, which is expected to take several quarters. The Company will communicate next steps for the program when available.

120. That same day, Bienaimé, Fuchs, and other BioMarin executives held a conference call with investors and analysts to discuss the Company's fourth quarter 2021 results, Fuchs responded to concern that the FDA's BMN 307 clinical hold might have application to "ROCTAVIAN safety data," conceding:

Very complicated question. Let's see if I can help there. As regards to the ROCTAVIAN preclinical data package and its similarity to what the FDA is asking for from 307, since *we just got the clinical hold letter from the FDA on 307, and they've requested additional studies, but they haven't specified additional studies*, and as I mentioned, we're going to be working with them to try to understand what those additional studies will likely be, it would be impossible to compare and contrast what's been asked for 307 with what's available already for 270.

121. In response to the news on February 17, 2022, issued after the market closed, that the FDA was not lifting the clinical hold on BMN 307 and was requiring additional data from non-clinical studies which was now "expected to take several quarters," the price of BioMarin shares fell on February 18, 2022, dropping 6.0%, ($5.44 per share) on heavy volume, as investors digested the magnitude of the extended FDA hold and additional non-clinical data requirements. Then, days later, in response to the Company's quarterly filing and conference call with investors and

1  analysts after the market closed on February 23, 2022, further revealing that the clinical hold would

2  not be lifted and that the FDA was requiring additional data which was "expected to take several

3  quarters," the price of BioMarin shares fell further on February 24, 2022, dropping an additional

4  6.27% ($5.17 per share) on extremely heavy volume of over 4,000,000 shares traded, as investors

5  digested the scope and magnitude of the adverse news.

6  **ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER**

7    122.   As alleged herein, Defendants acted with scienter in that Defendants knew, or

8  recklessly disregarded, that the public documents and statements issued or disseminated in the

9  name of the Company, or their own name, were materially false and misleading; knew or recklessly

10  disregarded that such statements or documents would be issued or disseminated to the investing

11  public; and knowingly and substantially participated or acquiesced in the issuance of such

12  statements or documents as primary violations of the federal securities laws.

13    123.   ***The Fraud Alleged Herein Relates To BioMarin's Core Business and Its***

14  ***Important PKU Franchise Which Was Then Under Competitive Pressures***.   That Defendants'

15  material misstatements and omissions concerned events relating to one of BioMarin's most

16  significant franchises and product lines supports a strong inference of scienter, particularly as

17  BioMarin was a relatively small company with management focused on warding off competition

18  to its important PKU franchise as Kuvan was coming off of protection and would soon be facing

19  generic competition.   As of the start of the Class Period, BioMarin's portfolio included only six

20  FDA-approved drugs and three drugs in development, including BMN 307.   Defendants confirmed

21  that BMN 307 had completed pre-clinical mouse and non-human primate studies in the first half

22  of 2019 (¶¶7, 53, 57, 62-63) and had received approval to begin Phase I/II human clinical trials in

23  early 2020.   Indeed, Defendants' SEC filings documented the transition from "Preclinical" to

24  "Clinical Phase I/II" in 1Q 2020.   ¶75.   And at the beginning of the Class Period and throughout

25  the period, other companies were also well underway towards developing competing PKU gene

26  therapies, including Homology Medicines, Inc., which, by May 2019, had also completed

27  preclinical trials and had been granted FDA clearance of their own IND.

28

124.    Defendants held high-ranking positions, as described in ¶¶23-25, and made numerous Class Period statements regarding BMN 307's pre-clinical trials, including as to BMN 307's pre-clinical durability studies, doing protocols, the 80-week lifetime pre-clinical studies, and BMN 307's safety and efficacy.  ¶¶62-65, 68-72, 75-76, 79-81, 84-88, 91-95, 98-102, 106, 109-110.  That Defendants spoke of BMN 307 so frequently demonstrates the core nature of the Company's BMN 307 gene therapy product, and the individual defendants' involvement in and knowledge of the same.  Defendants repeatedly assured investors about BMN 307's promising pre-clinical durability and efficacy studies and data, adopting statements such as "PKU preclinical data in the ENU2 mouse, it looks awesome," (¶87) and assuring investors that "[t]he mouse data looked great as far out as the eye could see in terms of durability," (¶63) "we've got our safety. Our toxicology is done.  Our efficacy is completed."  (¶62)  Given the core nature of BioMarin's gene therapy development pipeline, specifically BMN 307, underlying the fraud alleged herein, and Defendants' frequent assurance of their personal involvement in and knowledge of that development, knowledge of the fraud may be imputed to Defendants.  Indeed, in order to speak so knowledgeably regarding BMN 307 and its pre-clinical studies and data, defendant Bienaimé, Fuchs, and Cardon must have educated themselves regarding the pre-clinical studies and data by reading research reports, receiving updates and briefings on the status and progress of such studies, and by performing their own due diligence.

125.    Cardon, the face of BioMarin's PKU gene therapy development, had introduced investors to BMN 307 as the "main event" at the 2018 R&D Day and was the executive who was to use BMN 307 to drive the Company's "pill to proteins to gene therapy" strategy (¶52).  From the beginning, Cardon held himself out as knowledgeable about BMN 307's pre-clinical studies and development timeline:  "*there's a number of studies*, there's *hundreds of mice involved in various studies* . . . *we took on a lifetime study of mice, so the full longevity of mice, 80 weeks it is in this particular model*, and asked *what the effect of this particular treatment is on those*." (¶¶6, 52).  In addition, Cardon confirmed on November 14, 2019, that having completed pre-clinical studies and with an IND filing "imminent," "*we've got our safety.  Our toxicology is done. Our efficacy is completed*." (¶62). Moreover, defendant Cardon assured investors that with respect

1    to the pre-clinical study that led to the observed liver tumors, "***The mouse data looked great as***
2    ***far out as the eye could see in terms of durability***." (¶63).  And just a few weeks after BioMarin
3    disclosed the truth about BMN 307's preclinical studies and data and disclose the observed liver
4    tumors in the pre-clinical mouse durability study, defendant Cardon disappeared from the
5    Company.

6         126.    In addition, Defendants' acknowledged during the Class Period that they were
7    unable to and could not know the correct human dose "until we get to human clinical trials"
8    because "you can only find that out when you go into human[ clinical trials]" and "we may have
9    to go to a higher dose as well." (¶¶60, 80)  Having held themselves out as knowledgeable about
10   dosing protocols and their inability to identify the proper human dose until they were actually
11   dosing human clinical trial patients, Defendants' excuse at the end of the Class Period that the
12   liver-tumor-causing dose of BMN 307 was "***much higher than the dose that we treat our patients***
13   ***so far***" (¶112) is not credible and is further indicia of Defendants' scienter.  Indeed, while
14   discussing dosing and dose escalation throughout the Class Period, Defendants knew but failed to
15   disclose the observed liver tumors in a pre-clinical durability mouse trial.

16        127.    BioMarin's business is the development and sale of pharmaceuticals and
17   therapeutics.  The fraud alleged herein directly concerns BioMarin's ability to successfully develop
18   the next phase of its "pills to proteins to gene therapy" strategy in its PKU franchise and, in turn,
19   protect a franchise that represented more than 30% of the Company's revenue.

20        128.    ***Defendants Knew The Undisclosed Liver Tumors and Adverse Preclinical Study***
21   ***Raised Serious Concerns About BMN 307's Safety and What it Meant for Clinical Trials***.
22   Defendants have long been aware of the FDA's position and its corresponding implications for
23   clinical testing of gene therapy drugs.  As noted above, the FDA has repeatedly recognized the
24   safety concerns with the development of gene therapy drugs and put in place strict safety
25   monitoring procedures to ensure that any preclinical program justifies proceeding to clinical
26   studies on humans.  In guidance and presentations delivered to drug sponsors before the pre-
27   clinical studies for BMN 307 were completed, the FDA made clear that tumorigenicity safety
28   concerns were "important" in determining the safety profile of a drug and must be assessed before

human clinical trials could be conducted.  And Defendants knew or were reckless in not knowing that in guidance and presentations delivered to drug sponsors before the pre-clinical studies for BMN 307 were completed, the FDA made clear that tumorigenicity safety concerns were "important" in determining the safety profile of a drug and must be assessed before human clinical trials could be conducted.  Here, the liver tumors observed in the pre-clinical study not only meant that BMN 307's clinical progress would be halted, but threatened to significantly delay the Company's planned commercialization of the drug.   Such extensive delays would render BioMarin's PKU franchise vulnerable to further competitive pressures from new generic drugs and competing gene therapies.

129.   ***Defendants Capitalized on BioMarin's Inflated Stock Price to Unload Millions of Dollars' Worth of BioMarin Stock.***   At the same time that defendants Bienaimé, Fuchs, and Cardon were issuing materially misleading statements to investors, Bienaimé and Fuchs took advantage of BioMarin's inflated stock price to sell more than $48 million dollars' worth of their BioMarin holdings during the Class Period. By withholding information concerning the tumors observed in pre-clinical trials and cashing out before the fraud was revealed, defendants Bienaimé and Fuchs avoided substantial losses on their insider sales.

130.   Significantly, $19.4 million of Fuchs' $22.8 million in insider sales proceeds was purportedly pursuant to a 10b5-1 trading plan executed on March 11, 2020, after the pre-clinical trials were complete and just two months after Defendants announced that the FDA had approved BMN 307's IND and that the Company was proceeding with clinical trials.  As he was reaping more than $22.8 million in insider sales proceeds, Fuchs knew but failed to disclose that tumors had been observed in pre-clinical studies, which the Company confirmed had been completed in the first half of 2019.

131.   Over this same period of time, and also purportedly pursuant to several 10b-5 trading plans entered into or amended at various times shortly before each transaction, Bienaimé offloaded more than 298,000 shares of BioMarin stock at inflated prices, for proceeds of more than $25.2 million.  Similarly, Bienaimé's insider sales proceeds came as he knew but failed to disclose that tumors had been observed in pre-clinical studies, which the Company had confirmed had been

completed in the first half of 2019.  And Bienaimé continued selling BioMarin shares in December 2021 and January 2022 as Defendants were telling the market that, despite not yet having the FDA's clinical hold letter, they were optimistic that the clinical hold would be lifted in the first quarter of 2022.

132.    Defendants made insider trades while they delayed the release of negative news about tumors identified in the pre-clinical BMN 307 studies in order to circumvent their trading plans and offload their stock at favorable and inflated prices.  These trades were highly unusual and departed from their historical trading patterns.  During the Class Period, defendant Fuchs sold more than 186,600 shares of BioMarin stock, or 64% of his BioMarin holdings, for proceeds of more than $22.8 million.[11]  Likewise, Bienaimé sold more than 273,000 shares of BioMarin stock, or 28% of his holdings, for proceeds of more than $23.2 million.[12]

133.    Such transactions directly contravened BioMarin's Securities Trading Policy, which mandates "that our employees who possess material non-public information may not disclose, or trade while in possession of, such information."  In addition, "Individuals classified as 'Designated Insiders' (which include our NEOs) may not buy or sell [BioMarin] securities at any time without prior approval, except for sales under approved Rule 10b5-1 trading plans."[13]

134.    ***Defendants' Fraudulent Conduct Allowed Them to Retain Their Executive Positions and Collect Millions in Compensation and Bonus Awards***.[14]  The individual defendants were motivated to make false and misleading statements purely for self-preservation to preserve and maintain their executive positions and personally collect millions of dollars in compensation and bonuses.  Indeed, as set forth in BioMarin's 2020 Proxy Statement, dated April 14, 2020:

> The Compensation Committee establishes a mix of current, short-term and long-term incentive compensation, and cash and non-cash compensation, that it believes is appropriate to achieve the goals of our executive compensation program and our corporate objectives as described above. Generally, the percentage of

[11]   Holdings calculated pursuant to Fuchs' publicly-available July 22, 2022 SEC Form 4.

[12]   Holdings calculated pursuant to Bienaimé's publicly-available January 14, 2022 SEC Form 4.

[13]   SEC Schedule 14A, BioMarin's 2020 Proxy Statement.

[14]   Defendant Cardon's compensation information is not a matter of public record.

compensation at risk, either in the form of annual cash incentive or equity compensation, is higher for more senior employees than for those with more limited responsibility, with our executive officers having the highest percentage of their total compensation at risk and allocated to equity compensation. We believe this is appropriate as the more senior employees have more influence over whether we achieve our strategic imperatives and long-term goals.

135.    As set forth in the Executive Compensation section of the Company's 2021 proxy statement, dated April 13, 2021, "the Compensation Committee reviews the prior year development programs and determines an annual cash incentive payout attributable to that aspect of our business."   And 10% of the weighted target incentive award was identified as being attributed to "BMN 307: achieve regulatory submission milestones" for 2019 compensation and "BMN 307: achieve patient dosing milestones" for 2020 compensation.  As a result, Bienaimé achieved a maximum cash bonus of more than $2.32 million in 2019 and $1.6 million in 2020, while Fuchs achieved maximum cash bonuses of $828,000 and $535,000 in 2019 and 2020, respectively.

136.    Defendants' equity compensation was also based on a mixture of performance metrics, including a 50% allocation based on total shareholder return (i.e., stock price) and 25% for strategic corporate goals, such as product regulatory filings/approvals (*i.e.*, BMN 307's IND approval).  In 2019 and 2020, Bienaimé and Fuchs received maximum equity awards:

|  | Year | Stock Awards | Option Awards |
|---|---|---|---|
| **Bienaimé** | 2020 | $11,650,975 | $3,410,347 |
|  | 2019 | $11,581,044 | $3,220,218 |
| **Fuchs** | 2020 | $4,732,826 | $1,385,520 |
|  | 2019 | $4,275,463 | $1,189,277 |

137.    ***There Is A Strong Inference That BioMarin Acted With The Requisite Scienter.*** BioMarin's corporate liability derives from the actions of its agents.  The allegations herein establish a strong inference that BioMarin, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, because they failed to disclose the truth about BioMarin's PKU gene therapy,

1  including that pre-clinical studies for BMN 307, which Defendants represented had completed in

2  the first half of 2019, had revealed liver tumors at 52 weeks.  Taken all of the above collectively,

3  these facts create a strong inference that BioMarin acted with the requisite scienter.

4  **LOSS CAUSATION**

5  138.    Lead Plaintiffs incorporate by reference the allegations set forth above.  During the

6  Class Period, Defendants publicly disseminated materially false and misleading statements and

7  omitted material facts concerning the status and development of the Company's PKU gene therapy

8  product, as well as BMN 307's clinical and pre-clinical trials.

9  139.    The material misrepresentations and omissions included issues concerning, among

10  other things, BMN 307's pre-clinical trials and data; BMN 307's safety, efficacy and toxicology;

11  the dosing protocols of the human clinical trials and observed issues at various dosing levels; and

12  BMN 307's pre-clinical durability studies and observations.

13  140.    During the Class Period, as detailed herein, Defendants schemed to deceive

14  investors and the market, and engaged in a course of conduct that artificially inflated the price of

15  BioMarin common stock and operated as a fraud or deceit on members of the Class who purchased

16  BioMarin stock by misrepresenting and omitting material information about the status and findings

17  associated with the BMN 307 and its pre-clinical studies and data .  ¶¶66, 73, 77, 82, 89, 96, 103.

18  141.    When Defendants' prior misrepresentations and omissions were disclosed or

19  otherwise revealed to the market, beginning on September 5, 2021, and further revealed on

20  February 17 and 23, 2022, BioMarin's stock price declined significantly, as the prior inflation

21  came out of the price.  As a result of their purchases of BioMarin common stock during the Class

22  Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the

23  federal securities laws.

24  142.    Defendants' false and misleading statements and omissions, identified herein at

25  ¶¶66, 73, 77, 82, 89, 96, 103, had the intended effect and caused BioMarin's stock to trade at

26  artificially inflated levels throughout the Class Period.

27  143.    As a direct result of the disclosures on September 5, 2021, February 17, 2022, and

28  February 23, 2022, as detailed in ¶¶106, 118-120, BioMarin's stock price suffered significant

declines.  For example, from September 3, 2021 through the next trading on September 7, 2021, the price of BioMarin common stock traded on the NASDAQ dropped by $7.14 per share, or 8.4%.

144.   And as a direct result of the additional disclosures on February 17 and February 23, 2022, as detailed in ¶¶106, 118-120, BioMarin's stock price suffered additional significant declines.  Indeed, between February 17, 2022 and February 24, 2022, the price of BioMarin common stock traded on the NASDAQ dropped by $12.95 per share, or 14.3%.

145.   It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of BioMarin's stock. It also was foreseeable to Defendants that the revelation of the truth concerning BMN 307 and its pre-clinical studies, including that Defendants had observed liver tumors in a pre-clinical mouse study where 85% of "animals administered BMN 307 at the highest dose group (2e14 Vg/kg) had tumors on liver necropsy 52 weeks after dosing," and the resulting lengthy clinical hold would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## PRESUMPTION OF RELIANCE

146.   Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, BioMarin stock traded in an efficient market, for the following reasons, among others:

- BioMarin common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

- As a regulated issuer, BioMarin filed periodic public reports with the SEC and the NASDAQ;

- BioMarin regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

- BioMarin was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

147. In addition, and as a result of the foregoing, the market for BioMarin common stock promptly digested current information regarding BioMarin from all publicly available sources and reflected such information in the price of BioMarin common stock. Under these circumstances, all purchasers of BioMarin common stock during the Class Period suffered similar injury through their purchase of BioMarin common stock at artificially inflated prices and the presumption of reliance applies. The material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of BioMarin stock, and without knowledge of the misrepresented or omitted material facts, Plaintiffs and other members of the Class purchased or acquired BioMarin stock between the time Defendants misrepresented and/or failed to disclose material facts about the BMN 307 and the time the true facts were disclosed. Accordingly, Plaintiffs and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for BioMarin common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

148. Plaintiffs and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose. Because this action involves Defendants' failure to disclose material adverse information regarding BioMarin's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld are material in that a reasonable investor might have considered them important in making investment decisions.

**CLASS ACTION ALLEGATIONS**

149.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of BioMarin between November 14, 2019 and February 23, 2022, inclusive (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of BioMarin, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

150.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, BioMarin common stock was actively traded on the NASDAQ, one of the largest stock exchanges in the world.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. During the Class Period, there were more than 184 million shares of BioMarin common stock outstanding and the average daily trading volume was over 1.4 million shares.  Record owners and other members of the Class may be identified from records maintained by BioMarin or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

151.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts, omissions and common scheme to defraud as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about BMN 307; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

152.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct.

153.    Plaintiffs will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation.  Plaintiffs have no interests which conflict with those of the Class.

154.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendants BioMarin, Bienaimé, Fuchs, and Cardon

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

156.    During the Class Period, BioMarin, through its officers, management and agents, including Bienaimé, Fuchs, and Cardon, made or were responsible for the statements specified in ¶¶62-66, 68-73, 75-77, 79-82, 84-89, 91-96, 98-103, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157.    Defendants and the Company's officers, management and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange: (a) employed devices, schemes and artifices to defraud; (b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of BioMarin common stock during

the Class Period.  All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

158.   Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BioMarin common stock during the Class Period.

159.   BioMarin is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

160.   Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about BMN 307 and the tumors observed in BMN 307's pre-clinical trials.

161.   The allegations above establish a strong inference that BioMarin, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about BMN 307 and the tumors observed in BMN 307's pre-clinical trials. By concealing these material facts from investors, BioMarin's share price was artificially inflated during the Class Period.

162.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the

purpose and effect of concealing the truth BMN 307 and the tumors observed in BMN 307's pre-clinical trials and artificially inflating the price of BioMarin's common stock.

163.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BioMarin common stock.  Plaintiffs and the Class would not have purchased BioMarin common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

164.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of BioMarin common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of The Exchange Act
### Against All Defendants

165.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

166.    Defendants Bienaimé, Fuchs, and Cardon acted as controlling persons of BioMarin within the meaning of §20(a) of the Exchange Act.  BioMarin controlled all of its employees including Bienaimé, Fuchs, and Cardon.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and the development of BMN 307, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about BioMarin, defendants Bienaimé, Fuchs, and Cardon had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  Defendants Bienaimé, Fuchs, and Cardon participated in interviews and conference calls with investors and analysts, and/or prepared and approved the Company's public statements, SEC filings and press releases, described herein at ¶¶62-66, 68-73, 75-77, 79-82, 84-89, 91-96, 98-103, alleged by Plaintiffs to be misleading.

167.    In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  By reason of such conduct, Defendants are liable pursuant to §20(a).

168.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of BioMarin common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

1

## JURY DEMAND

2       Lead Plaintiffs hereby demands a trial by jury.

3   DATED:  March 25, 2022          ROBBINS GELLER RUDMAN
                                 &amp; DOWD LLP

4                                 SPENCER A. BURKHOLZ
                                DAVID W. MITCHELL

5                                 BRIAN O. O'MARA
                                STEVEN M. JODLOWSKI

6

7                                     s/ Brian O. O'Mara
                                  BRIAN O. O'MARA

8

9                                 655 West Broadway, Suite 1900
                                San Diego, CA  92101

10                                 Telephone:  619/231-1058
                                619/231-7423 (fax)

11                                 ROBBINS GELLER RUDMAN
                                 &amp; DOWD LLP

12                                 SHAWN A. WILLIAMS
                                Post Montgomery Center

13                                 One Montgomery Street, Suite 1800
                                San Francisco, CA  94104

14                                 Telephone:  415/288-4545
                                415/288-4534 (fax)

15

16                                 Lead Counsel for Lead Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

LOCAL 282 ANNUITY TRUST FUND and LOCAL 282 PENSION TRUST FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint filed and adopts its allegations. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below: None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this  24th  day of March, 2022.

LOCAL 282 ANNUITY TRUST FUND and
LOCAL 282 PENSION TRUST FUND


By:   _____
Mario Bulding, Fund Administrator

BIOMARIN

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Annuity**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/28/2021 | 600 | $82.30 |
| 02/08/2021 | 300 | $86.47 |
| 03/03/2021 | 215 | $76.43 |

**Pension**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/21/2020 | 312 | $86.98 |
| 12/21/2020 | 1,657 | $86.85 |
| 12/22/2020 | 7,160 | $88.64 |
| 12/23/2020 | 5,851 | $88.41 |
| 12/24/2020 | 2,914 | $88.71 |
| 02/04/2021 | 1,728 | $84.30 |
| 02/05/2021 | 209 | $85.10 |
| 02/05/2021 | 599 | $84.85 |
| 02/05/2021 | 845 | $84.57 |
| 02/08/2021 | 2,687 | $85.99 |
| 02/09/2021 | 363 | $85.71 |
| 02/09/2021 | 1,231 | $86.00 |
| 02/10/2021 | 460 | $85.26 |
| 02/10/2021 | 1,464 | $85.32 |
| 02/11/2021 | 182 | $86.25 |
| 02/11/2021 | 822 | $86.51 |
| 02/12/2021 | 1,487 | $87.00 |
| 08/24/2021 | 43 | $76.85 |
| 08/24/2021 | 1,104 | $76.90 |
| 08/25/2021 | 5,543 | $78.21 |
| 08/26/2021 | 4,169 | $78.90 |
| 09/17/2021 | 189 | $76.84 |
| 09/17/2021 | 439 | $76.57 |
| 09/17/2021 | 1,525 | $77.28 |
| 09/17/2021 | 7,294 | $77.22 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 02/02/2021 | 1,859 | $83.51 |
| 10/01/2021 | 3,935 | $76.53 |

Prices listed are rounded up to two decimal places.

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on March 25, 2022, I authorized the electronic

3

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4

notification of such filing to the email addresses on the attached Electronic Mail Notice List, and

5

I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to

6

the non-CM/ECF participants indicated on the attached Manual Notice List.

7

<u>s/ BRIAN O. O'MARA</u>
Brian O. O'Mara

8

9

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

10

11

12

Email:  bomara@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4859-7139-2022.v2

# Mailing Information for a Case 3:21-cv-08254-MMC Berlinger v. BioMarin Pharmaceutical Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com

- **Spencer A. Burkholz**
  SpenceB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer N. Caringal**
  JCaringal@rgrdlaw.com

- **Brett Hom De Jarnette**
  bdejarnette@cooley.com,jcorrell@cooley.com

- **John C. Dwyer**
  dwyerjc@cooley.com,eFilingNotice@cooley.com,efiling-notice@ecf.pacerpro.com,emadrigal@cooley.com

- **Steven M. Jodlowski**
  sjodlowski@rgrdlaw.com,E_File_SD@rgrdlaw.com,SusanM@rgrdlaw.com,bengfelt@rgrdlaw.com,ckopko@rgrdlaw.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,slandry@rgrdlaw.com,e_file_sd@rgrdlaw.com,stevej@rgrdlaw.com,ckopko@rgrdlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Jessica Valenzuela Santamaria**
  jsantamaria@cooley.com,emadrigal@cooley.com

- **Joshua Sol Schelly Walden**
  jwalden@cooley.com,agarcia@cooley.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)